**William J. CONDREN, Plaintiff,**

v.

**Michael P. GRACE, Defendant.**

**No. 84 Civ. 5797 (BN).**

United States District Court, S.D. New York.

Jan. 30, 1992.

Robinson Brog Leinwand Reich Genovese & Gluck, P.C. (David C. Burger, of counsel), New York City, for plaintiff.

Robert Eugene Smith, Palm Springs, Cal., Ralph J. Schwarz, New York City, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting as a United States District Court Judge by designation.

## INTRODUCTION

William J. Condren ("Condren"), residing in New York, brings this diversity action against Michael P. Grace ("Grace"), residing in California, seeking damages in the total amount of $68,060 coupled with recompense for his attorney fees and costs, in connection with two causes of action predicated upon breach of contract[1]. The presence of subject matter jurisdiction is founded upon 28 U.S.C. § 1332.

Grace denies liability and presses two counterclaims of his own sounding in legal malpractice and breach of contract. Thus, he seeks corresponding relief ranging from compensatory and punitive damages equaling $386,680.02 and $2,500,000, respectively, to demands for an accounting and the imposition of a constructive trust.

The following constitutes this court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a):

## DISCUSSION

The players in this episode, Condren, Grace and Corinne Grace[2], his spouse, first met between late 1977 and early 1978.

---

[1]. At the conclusion of trial Condren withdrew two separate causes of action for fraud and misrepresentation originally interposed against defendant Grace.

[2]. Corinne Grace, a former defendant in this action, has paid $35,000 to Condren in settlement of the claims against her and in reduction

Condren, a graduate of Harvard Law School, thereafter secured employment with a private New York law firm until approximately 1963. Since the mid–1960's Condren has intermittently functioned as a solo practitioner, with offices in New York, while also concentrating extensively in the direction of investment banking and general business ventures.

The Graces were married in 1954 but became separated as of August 1980. Grace entered into the energy business in 1960. Subsequently, he and his spouse accumulated substantial oil and gas properties in addition to uranium mine leases.

Evidently, during 1977–78 the Graces needed to obtain financing relating to a valuable portion of the uranium leases and oil and gas property assets within their control (hereinafter "mineral properties"). Through referral by Edgar Fitzsimmons ("Fitzsimmons"), a broker with E.F. Hutton, Condren was solicited with respect to orchestrating a private placement offering as to the Graces' mineral properties.

In assessing the requirements for the funding of the afore-mentioned Grace assets, Condren emphasized the need for property records and information to form the basis for the presentation of a formal offering memorandum. The Graces complied and provided certain files and records. Nevertheless, Condren decided that the information presented was not sufficient to convince any outside buyer to finance the Graces' investment proposal (Tr. 47; pltf's exh. 1).

Premised on Condren's negative assessment of the value of the information furnished thus far he proposed instead that the Graces offer a right of first refusal to satisfy their need for cash subsidies (Tr. 47). The court refrains, however, from analyzing Condren's proposal and/or approach due to the fact that on February 22, 1978 the Graces and Condren effectuated a written right of first refusal agreement, incorporating Condren's plan (the "First Refusal Agreement") (Agreed Findings of Fact "AFF" 5; pltf's exh. 2).

of the first of Condren's two currently pending

*First Refusal Agreement*

The signatories to the First Refusal Agreement contemplated, in relevant part, Condren's payment of $50,000 to Grace in return for the right of first refusal to execute any contract for the development of the Graces' mineral properties, proposed either by the Graces or by a third party and accepted by the Graces (pltf's exh. 2).

In further consideration of Condren's payment, the Graces agreed: "to make available to *you* [Condren] immediately any and all information which *we* [the Graces] have concerning each of our properties, which information *you* [Condren] would agree to hold in strictest confidence" (emphasis supplied).

Grace argues that Condren violated this confidentiality clause following execution of the First Refusal Agreement. Condren admits contacting Modrall, Sperling, Roehl, Harris & Sisk ("Modrall Sperling"), a law firm in New Mexico, for purposes of recording his security interest, and forwarding a copy of the First Refusal Agreement with certain attached information pertaining to the mineral properties (Tr. 49–51, 380).

It is true, of course, that the text of the confidentiality clause contains the broad phrase "any and all information." Notwithstanding, upon consideration of the qualifying harbinger "to make available to you [Condren] immediately" better reasoning excludes the First Refusal Agreement itself along with the attached property information referenced on its second page, copies of which the agreement indicated Condren had *previously* received.

Given such obviously limiting intent, it is concluded that the confidentiality clause solely prohibited Condren from divulging "any and all information" he had not already been furnished as of the making of the First Refusal Agreement. Hence, it cannot be found that Condren's actions to safeguard his security interest violated the confidentiality clause of the First Refusal Agreement.

claims for breach of contract.

During the pendency of the First Refusal Agreement, Koppen Mining Construction Corporation ("Koppen") made a proposal for development of some of the Graces' mineral properties. Thereafter, on March 24, 1978, a contract (the "First Koppen Contract") was entered into between Koppen and the Graces respecting Koppen's plan. On April 10, Condren offered to waive his right of first refusal as to the First Koppen Contract in return for payment of $75,000 (pltf's exh. 17); Condren received that sum from Koppen on July 3, 1978.

*Withdrawal Agreement*

On August 4, a second mining contract was formed between Koppen, the Graces and two corporations controlled by the Graces, pertaining to the development of certain other mineral properties equally subject to the First Refusal Agreement (the "Second Koppen Contract").

By August 15, Condren and the Graces had collectively executed a written agreement (the "Withdrawal Agreement") by which Condren agreed to abandon his right of first refusal respecting the Second Koppen Contract, and to terminate all his remaining rights in and to the First Refusal Agreement in exchange for $85,000 out of the first royalties materialized in conformance with the Second Koppen Contract (AFF 10; pltf's exh. 3). The text of the Withdrawal Agreement prepared by Dinsmore Adams ("Adams"), an attorney with the law firm of Phillips, Nizer, Benjamin, Krim & Ballon ("Phillips Nizer"), at the request of Grace (Tr. 229, 335–36), was drafted in the form of a letter from the Graces to Condren.

The gravamen of the dispute herein, and the subject of Condren's first claim, concerns the proper interpretation of the following terms appearing in the ultimate paragraph of the Withdrawal Agreement: "we [the Graces] shall irrevocably advise Koppen mining to pay said $85,000 directly to you [Condren]."

After reviewing the contrary assertions the court determines that this language clearly sets forth a directive instructing the Graces to notify Koppen of Condren's en-titlement to receive the first $85,000 in royalties arising from the Second Koppen Contract.

Significantly, there is persuasive physical evidence and testimony establishing Koppen's issuance of royalty payments to the Graces amounting to at least $85,000 dollars in accordance with its contractual obligations (pltf's exh. 11, 12; Tr. 128, 148–150). Indeed, according to Grace, Koppen paid out "roughly in the neighborhood of $800,000 to $1,000,000 dollars" (Tr. 151). But it is unclear to Grace who received these payments, and he personally denies receiving any royalties due to him under the Second Koppen Contract (Tr. 151–52).

Condren asserts that the Graces' failure to so advise Koppen directly violated the Withdrawal Agreement resulting in Condren's damages of $50,000, plus interest. This adjusted figure reflects the $35,000 payment Condren had received in connection with a settlement agreement between Condren and Corinne Grace (*see* fn 2, *supra*).

In response, Grace denies the allegation that the Withdrawal Agreement created any obligation in the Graces for transfer of the $85,000 sum. Moreover, Grace demands rescission characterizing the Withdrawal Agreement as an illegal product of persistent "over-reaching" developed in part from Condren's receipt of $75,000 in connection with waiving his right of first refusal under the First Koppen Contract, and from Condren's purported abuse of his fiduciary relationship under a tacit attorney-client agreement commencing in February 1978, contemporaneous with the formulation of the First Refusal Agreement. Condren insists his sole function then was as a private placement agent or as an investment broker, without any of the attendant fiduciary duties associated with an attorney-client relationship (Tr. 41, 44–45).

In New York, the term "overreaching" has been interpreted to mean: "to overdo matters, or get the better of one in a transaction by cunning, cheating or sharp practice." *In re Baruch's Will*, 205 Misc. 1122, 1124, 132 N.Y.S.2d 402, 405 (Surr.Ct.Suff.

Cty.1954), *aff'd*, 286 A.D. 869, 142 N.Y.S.2d 216 (2d Dep't.1955).

■ As to the issue of fiduciary obligation, the role of a lawyer *vis a vis* the interests of his client is categorized as that of fiduciary trustee. *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976) (*citing Hafter v. Farkas*, 498 F.2d 587, 589 (2d Cir.1974); *Spector v. Mermelstein*, 361 F.Supp. 30, 38 (S.D.N.Y. 1972), *modified on other grnds.*, 485 F.2d 474 (2d Cir.1973); Wise, *Legal Ethics* 256 (2D ED.)).

■ As a fiduciary, the lawyer is obliged to exercise the highest degree of good faith, honesty, integrity, fairness, and fidelity. *In re Trybom's Estate*, 168 Misc. 484, 6 N.Y.S.2d 29 (Surr.Ct.West.Cty.1938); *Krohe v. Goldman*, 167 Misc. 930, 4 N.Y.S.2d 851 (NYC Mun.Ct.1938). *See In re Kelly*, 23 N.Y.2d 368, 296 N.Y.S.2d 937, 244 N.E.2d 456 (1968).

> This fiduciary or trust relationship precludes the attorney from having personal interests antagonistic to those of his client or from obtaining personal advantage or profit out of the relationship without the knowledge or consent of his client.

*Hafter*, 498 F.2d at 589.

Turning to the matter at bar, however, Grace fails to introduce any legal precedent which sustains his "overreaching" argument. Plainly, the $75,000 in question was paid to Condren by Koppen, *not the Graces*, in exchange for Condren's waiver of his enumerated rights under the First Refusal Agreement. But Grace has not demonstrated that payment from an outside third entity qualifies as "overreaching" as between two independently contracting parties.

■ Further, the court determines that Condren was *not* serving in the capacity of attorney for the Graces prior to March 5, 1979, the date Professional Services Agreement #1 came into play. Condren plausibly affirmed having ceased the active practice of law sometime in the mid–1960's, thereafter providing intermittent legal representation for clients solely in isolated matters while focusing primarily in business and investment oriented opportunities (Tr. 38–39, 314). In addition, highlighted portions of Grace's deposition testimony offered at trial unequivocally demonstrate that Condren was referred to Grace as Fitzsimmons' "co-broker" and functioned as a "broker" during the sequence of events culminating in the making of the First Refusal Agreement (Tr. 214–15, 220).

Indeed, there is a dearth of *any* credible evidence which establishes that Condren and Grace were engaged in a relationship of a fiduciary nature when the First Refusal Agreement came into effect. Conversely, in that time frame Condren maintains that Grace personally consulted at least two attorneys, namely Adams and Jerome Berger (Tr. 315–16). Berger flatly denies functioning as legal counsel for Grace during that period. Berger only recalled accompanying Grace at the initial meetings with Condren for the limited purpose of providing comfort and support in consideration of Grace's encephalitis, a medical condition causing Grace to periodically "phase out" (Tr. 157–58).

Nevertheless, Berger's account was cast into grave doubt at trial. The court finds particularly compelling Condren's essentially unrebutted testimony recounting Berger's participation in discussions with Condren on Grace's behalf, relative to the $75,000 Condren received under the First Refusal Agreement and even more so, Condren's subsequent demands for the $85,000 under the Withdrawal Agreement (Tr. 315–16).

Buttressing Condren's testimony and rendering Berger's account truly suspect is damaging physical evidence in the form of correspondence addressed to Berger from Koppen's legal team which alludes specifically to Berger *as counsel for the Graces* ("we are aware of *your clients'* obligations to present this transaction to Mr. Condren under his right of first refusal" (emphasis supplied)), and also documents his active involvement during the pendency of the Second Koppen Contract (pltf's exh. 14, 15, 16).

As the facts indicate, and the court determines, Condren was not serving in the capacity of lawyer for the Graces at any point relevant to the inception of the First Refusal Agreement or the Withdrawal Agreement. Hence, Grace's opposition to the validity of either contract, tenuously based upon Condren's alleged attorney misconduct theory, lacks merit. Grace's request for rescission on that ground is denied.

Grace interposes certain other seemingly weak objections concerning whether or not Condren safeguarded his rights under the Withdrawal Agreement by making "formal" or "written" demands on the Graces, or any demands whatsoever on Koppen for the subject $85,000 prior to the commencement of Condren's suit in August 1984.

In similar fashion to Grace's "overreaching" theory, he fails to direct the court to any legal authority recognizing that a party must undertake by "written" or "formal" means to assert contractual rights. Significantly, without rebuttal, Condren testified that his demands for payment of the $85,000 were conveyed *orally* to Grace on multiple occasions (Tr. 57–58, 346–47).

It is also uncontroverted that although contact was initiated by Condren with a New Mexico attorney whom Condren knew represented Koppen, and inquiry followed concerning Koppen's issuance of royalties (Tr. 104–5), ultimately Condren discovered that Mr. Koppen had "disappeared in the direction of Mexico," precluding direct recourse, assuming *arguendo* it was available against Mr. Koppen (Tr. 132–33).

Grace raises no further issues which pose an obstacle to the enforceability of the Withdrawal Agreement. Consequently, the court finds that Grace was a party to this agreement and bears a contractual obligation to Condren, independent of Grace's *actual* personal receipt of any of the royalty payments, for the remaining balance of $50,000 (out of the contemplated $85,000 offered by the Graces as consideration for Condren's specified performance under the Withdrawal Agreement).

*Assignment Contract*

The litigants entered into an independent written assignment contract, dated May 22, 1978 ("Assignment"). Under the terms of this assignment, drafted by a G.D. Ashabranner, an Oklahoma attorney retained by Condren (deft's exh. A), Grace offered Condren his interest in an undivided one-half (½) oil and gas leasehold property, located in Canadien County, Oklahoma ("oil and gas lease"). The acreage in question contained a single gas well jointly operated pursuant to a lease agreement between Grace and the Amoco Production Company ("Amoco"). Condren also became entitled to share Grace's proceeds from the gas well evenly and to recover any out of pocket expenses incurred, with interest.

In exchange, Condren would be required: to pay Grace's continuing share of the drilling expenses mandated under the Amoco joint operating agreement; to bear the costs of any litigation with Amoco which had evidently shouldered a portion of Grace's prior share of drilling, completing and operating the gas well; and, to provide Condren's services regarding such matter without charge (Tr. 108). Condren recorded this Assignment of the oil and gas lease on June 6 in the records of the Clerk of Canadien County.

The spacing requirements which governed development of the acreage assigned by Grace to Condren did not permit the drilling of a second well at the time the Assignment was executed (Tr. 378–79). In point of fact, a second well was drilled on that property by Amoco with ensuing completion on September 4, 1978. There simply is no proof, however, that either of the parties possessed knowledge regarding the drilling of a second well at the time of the execution of the Assignment in May.

The core of Grace's breach of Assignment contract counterclaim is built upon the allegation that Condren secured the Assignment and garnered between $500,000 and $600,000 in revenue from that second well—none of which has been shared with Grace under the oil and gas lease—by taking unfair advantage of their fiduciary

relationship while engaged in business dealings with Grace.

Grace seeks an award of $250,000 in compensatory damages and $2.5 million in punitive damages flowing out of his purported exclusion from participation in the second well proceeds on the acreage assigned by Grace to Condren.

Condren acknowledges receiving profits ranging between the amounts alleged by Grace (Tr. 112), but Condren maintains entitlement to the proceeds for the reason that the drilling of the second well transpired as a result of an unpredictable change in the spacing requirements which was implemented by Oklahoma authorities.

In any event, Condren proposes that Grace's theory is barred by the *res judicata* and *collateral estoppel* effect of prior decisions in the Oklahoma courts. Those Oklahoma rulings granted Condren's motion for summary judgment with respect to Grace's challenges to the validity of the Assignment, and claims to the proceeds generated by the second well, in connection with Grace's petition to intervene in Condren's action against Amoco (pltf's exh. 10).

The short of the matter—the court need not delve into the heated controversy surrounding whether or not Grace's counterclaim is barred by the above stated principles in view of the court's finding that *no such fiduciary relationship* existed between the litigants during the time frame relative to the Assignment. More, as it is clear that the sole ground put forth in support in furtherance of this allegation, namely professional misconduct, fails to demonstrate the most crucial prerequisite underpinning Grace's counterclaim, i.e. the presence of an attorney-client bond augmenting the litigants' business relationship, Grace's counterclaim for breach of the Assignment is dismissed.

*Professional Services Agreements # 1 and # 2*

Condren and Grace developed an attorney-client relationship as of March 5, 1979. Their resultant agreement ("Professional Services Agreement # 1") memorialized Grace's consent to pay Condren a $50,000 retainer in exchange for Condren's under-taking to replace Phillips Nizer in representing Grace with regard to a certain arbitration ("Santa Fe Arbitration") involving the Santa Fe Pacific Railroad Company ("Santa Fe Railroad"). The matter in arbitration related to certain uranium bearing tracts in New Mexico which had been leased by Grace from the Santa Fe Railroad and also represented an extremely valuable portion of the mineral properties subject to the First Refusal Agreement (pltf's exh. 2).

On December 16, 1982, Condren and Grace entered into a second written professional services agreement ("Professional Services Agreement # 2") relating to Grace's defense in an action filed by Phillips Nizer aimed at recovery of legal fees and disbursements amounting to $122,-035.78 ("Phillips Nizer action"). The fees in dispute had accumulated as a result of prehearing services rendered by Phillips Nizer for Grace in the Santa Fe Arbitration.

Condren represented Grace in the Phillips Nizer action through discovery and a bench trial before United States District Judge Charles S. Haight, Jr. At a pre-trial conference dated December 9, 1983 Condren apprised the court of the potential for a conflict of interest stemming from Condren's defense of Grace in the Phillips Nizer action while the Graces asserted an adverse position to that of Condren by attempting to intervene in Condren's pending Oklahoma claim against Amoco (built upon Condren's assigned interest in the oil and gas lease) (Tr. 124–27).

Condren maintains that he reviewed the conflict of interest issue with Grace *prior* to the December 9 conference before Judge Haight and received instructions to proceed with representation (Tr. 122–23, 341–42, 393). Grace vigorously denies discussing the matter with Condren until *immediately prior to trial* in March of 1984 (Tr. 202–04).

Through the course of litigation, Condren also became aware of Grace's desire to pursue an appeal in the event the action resulted in an unfavorable outcome. On

March 8, 1984, the closing day of trial, and roughly one and a half months prior to the entry of judgment in favor of Phillips Nizer, dated April 24 and totalling $136,680.02, with interest, Condren indicated his refusal to comply with Grace's demand. By Condren's reasoning, an appeal was frivolous at that point in time, and thus he advised Grace to engage other counsel to undertake his appeal. Subsequently, no appeal was filed or taken (Tr. 73–74, 342–44).

At the conclusion of Professional Services Agreement # 2 Condren rendered his bill demanding payment of $18,060 from Grace, based upon legal fees and disbursements incurred in defending against the Phillips Nizer action (AFF 17, pltf's exh. 8, 9). Payment of the bill was not made and Grace's continued refusal to deliver this sum to Condren now formulates the subject of Condren's second claim requesting legal fees.

Grace responds that the net effect of Condren's claim for $85,000 under the Withdrawal Agreement compounded by the adverse position taken by Grace in Condren's Oklahoma suit against Amoco created an overwhelming conflict of interest of which Condren never advised Grace for purposes of securing his informed consent. Further, by not apprising Grace of the potential for various conflicts of interest, Condren purportedly breached the attorney's ethical duty requiring communication of all material matters to the client.

Finally, Grace brings a counterclaim alleging legal malpractice resulting from Condren's failure to adequately prepare Grace for trial or pursue appeal with respect to Condren's representation of Grace in the Phillips Nizer action. In that regard Grace seeks judgment in the sum of $136,-680.02, the amount of fees awarded to Phillips Nizer by way of Judge Haight's decision, and paid by Grace in satisfaction of judgment on April 23, 1985. The court addresses the litigants' opposing claims seriatim.

*Legal Fees*

 First. As to Condren's demand for legal fees, there is no dispute that in the Phillips Nizer action Condren undertook the performance of professional legal services, on behalf of Grace, which were duly specified in the bill sent to him for $18,060, and that payment was never rendered for that amount.

At issue, in view of Grace's breach of fiduciary duty defense is whether or not Condren's representation of Grace violated any ethical obligation or fiduciary duty owed between attorney and client thereby negating Condren's entitlement to legal fees. Without question, case law addressing the topic of breach of an attorney's fiduciary duties to his client sanctions denial of legal compensation. *See Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941); *Silbiger v. Prudence Bonds Corp.,* 180 F.2d 917 (2d Cir.), *cert. denied,* 340 U.S. 831, 71 S.Ct. 37, 95 L.Ed. 610 (1950). A brief history on the appropriate remedies as discussed by Chief Judge Learned Hand in the landmark *Silbiger* decision is instructive:

> Certainly by the beginning of the Seventeenth Century it had become a commonplace that an attorney must not represent opposed interests; and *the usual consequence has been that he is debarred from receiving any fee from either no matter how successful his labors* ... [T]he prohibition is absolute and the consequence is forfeiture of all pay.

*Id.* at 920–21 (emphasis supplied).

At trial Grace's expert witness, Dean Monroe Freedman, ("Dean Freedman"), a well-known scholar on the topic of lawyers' and judges' ethics (deft's exh. D), discussed the attorney's ethical obligations to his client with focus on the issues concerning conflict of interest and communication of material information.

Dean Freedman's explanation invoked references to Canons 1 and 5 of the American Bar Association Code of Professional Responsibility which symbolize the ethical precepts embodying maintenance of integrity and competence as well as loyalty and the exercise of independent professional judgment imposed upon all members of the legal profession. As Dean Freedman remarked:

[T]he idea of conflict of interest is a potentiality, and that potential is there of a hostile attitude on the part of the lawyer to the client where the lawyer is supposed to be the client's zealous advocate against the rest of the world and at the same time views the client as someone who owes him a substantial amount of money that isn't being paid and also has been charged by the client with or on the client's behalf with breach of fiduciary obligations, it would take a saint to overlook those things and to represent the client with the degree of zealousness and loyalty that the disciplinary rules require.

I'm not saying that it is not a waivable conflict. Others would. In my view, I take a very broad view of what is waivable. But unless the lawyer explained this fully and the client voluntarily and knowingly consented, then there would be a violation.

(Tr. 277–78).

In addition, Dean Freedman emphasized that *full* disclosure of material information and discussion of conflicts of interest requires the attorney to thoroughly review the positive benefits of representation while simultaneously raising the potential negative detriments. By way of example, Dean Freedman elaborated upon such negative aspects as the extreme difficulty of maintaining loyalty and zeal on the client's behalf during the occurrence of separate litigation between attorney and client, particularly where it involves accusations involving breach of fiduciary duty.

Another negative aspect to be considered for purposes of full disclosure is an attorney's contemplation of asserting a claim against his client; in this case, the $85,000 claim pursuant to the Withdrawal Agreement (Tr. 301–02). As Dean Freedman observed, however, adequate communication of Condren's belief that a debt was owed and discussion with Grace about how that might affect Condren's obligation of loyalty and zeal coupled with Grace's knowing and voluntary consent to the relationship would obviate, in Dean Freedman's view, the inherent ethical dilemma facing the attorney (Tr. 297).

Upon careful review of the testimony and other evidence pertaining to the subject of Condren's professional conduct following the memorialization of Professional Services Agreement #1, the court finds Condren failed to satisfy his ethical obligations to Grace and therefore Condren must forfeit his fee.

While the court is persuaded that Condren impressed his oral demands for payment of the $85,000 on Grace, there has not been any showing that after being formally retained Condren detailed to Grace the diametrically conflicting ethical ramifications between Condren's festering monetary claim with the attorney-client bond which was developing among Condren and Grace.

Equally if not more troubling for Condren is his admitted failure to relay specific instructions from Judge Haight to put Grace on notice of the *potentially* serious conflict of interest posed by the mere fact of his intervention in Condren's Amoco claim, irrespective of the eventual outcome, while Condren represented Grace in the Phillips Nizer action. Even providing Condren the benefit of the doubt as to his assurances that Grace was apprised and orally acceded to waiver of the conflict prior to the pre-trial conference with Judge Haight, once Condren was directed to bring the matter home to Grace to decide for himself "whether the defendant [Grace] wished to make a timely substitution of counsel" (Tr. 124; def't's exh. b), as a function of Condren's ethical duties it became incumbent on him to return to Grace to communicate this information and re-advise Grace accordingly.

Admittedly, this Condren did *not* do. Therefore, Grace is excused from payment of Condren's bill for legal services in connection with the Phillips Nizer action. *See, e.g. Woods,* 312 U.S. at 267–68, 61 S.Ct. at 496–97; *Silbiger,* 180 F.2d at 920–21; *Financial General Bankshares, Inc. v. Metzger,* 523 F.Supp. 744, 773 (D.C.C.1981); *Zeiden v. Oliphant,* 54 N.Y.S.2d 27, 29 (Sup.Ct.N.Y.Cty.1945).

*Malpractice*

■ Second. Grace counterclaims for malpractice resulting from Condren's purportedly inadequate representation of Grace in the Phillips Nizer action and Condren's failure to take on appeal therefrom.

The components of a legal malpractice action in New York are: (1) the existence of an attorney-client relationship, (2) negligence on the part of the attorney or some other conduct in breach of the relationship, (3) proximate causation, and (4) proof that but for the attorney's alleged negligence the client would have succeeded in the underlying cause of action. *Hanlin v. Mitchelson,* 794 F.2d 834, 838 (2d Cir.1986) (*citing Fidler v. Sullivan,* 93 A.D.2d 964, 463 N.Y.S.2d 279, 280 (3d Dep't 1983); *N.A. Kerson Co. v. Shayne, Dachs, Weiss, Kolbrenner, Levy and Moe Levine,* 59 A.D.2d 551, 397 N.Y.S.2d 142, 144 (2d Dep't 1977) (Suozzi, J., concurring) *aff'd,* 45 N.Y.2d 730, 408 N.Y.S.2d 475, 476, 380 N.E.2d 302, 303 (1978) (affirming for reasons stated in concurrence of Suozzi, J.).

Although Condren's ethical violations certainly rise to the level warranting forfeiture of his legal fees respecting the Phillips Nizer action it does not automatically follow, without evidence which satisfies all of the above-stated factors, that Grace has established a cause of action sounding in legal malpractice.

But here, Grace's protests are not substantiated by the weight of the evidence. Additionally, given Judge Haight's overwhelming approval respecting the merits of Phillips Nizer's claim (pltf's exh. 7), and based on the testimony adduced at trial, it cannot be said that Condren's efforts in orchestrating Grace's trial defense, while unsuccessful, fell outside the realm of adequate representation. Thus, Grace's second counterclaim for purported legal malpractice is hereby barred.

## CONCLUSION

In accordance with the foregoing Findings and Conclusions pursuant to Rule 52(a):

First, with respect to Condren's claim for breach of the Withdrawal Agreement the court awards damages to Condren in the amount of $50,000. Since the record is unclear as to the precise date, prior to suit, when royalties equaling this amount were first issued under the Second Koppen Contract, Condren is awarded prejudgment interest at a rate of nine percent (9%) per annum from the time of commencement of this action, August 14, 1984. *See Brent v. Keesler,* 32 A.D.2d 804, 805, 302 N.Y.S.2d 349, 351 (2d Dep't 1969); *see also* N.Y.CPLR §§ 5001, 5004.

Second, Condren's claim for $18,060 for legal fees arising from Condren's representation of Grace in the Phillips Nizer action is dismissed and Grace is excused from payment.

Third, Grace's counterclaims for breach of the Assignment contract and for legal malpractice are also dismissed.

Fourth, each party will bear its own attorneys' fees and costs.

Accordingly, the Clerk is directed to: (1) enter judgment in favor of Condren for $50,000, with prejudgment interest at the rate of 9% per annum, commencing on August 14, 1984, as to his first contract claim for breach of the Withdrawal Agreement; (2) dismiss Condren's second claim for $18,060 in legal fees in favor of Grace; (3) dismiss both of Grace's counterclaims for breach of the Assignment contract and for legal malpractice, in favor of Condren.