**Thomas B. HEALY, Jr.,**
**Plaintiff–Appellant,**

v.

**RICH PRODUCTS CORP.,**
**Defendant–Appellee.**

**No. 86, Docket 92–7398.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1992.

Decided Dec. 7, 1992.

Bettina B. Plevan, New York City (Myron D. Rumeld, Roberta K. Chevlowe, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for plaintiff-appellant.

Paul B. Zuydhoek, Buffalo, N.Y. (Hugh M. Jones, Mark E. Brand, David R. Hayes, Phillips, Lytle, Hitchcock, Blaine & Huber, of counsel), for defendant-appellee.

Before MINER, ALTIMARI and WALKER, Circuit Judges.

MINER, Circuit Judge:

Plaintiff-appellant Thomas B. Healy, Jr. appeals from a judgment entered on March 5, 1992 in the United States District Court for the Western District of New York (Elfvin, J.) rejecting on summary judgment motion plaintiff's claim that certain pension plan benefits were preserved by the terms of an exception to a general release executed in connection with a stock purchase agreement, and rejecting after trial plaintiff's claim to reform the release exception for mutual mistake and fraud. In an order entered on April 1, 1991, 1991 WL 46514, Judge Elfvin partially granted defendant's cross-motion for summary judgment, ruling, as a matter of law, that the meaning of the exception language found in the general release clause of the stock purchase agreement (the "Purchase Agreement") entered into between Healy and defendant Rich Products Corp. ("Rich Products") was governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (1988), ("ERISA"), and that the language did not preserve Healy's right to receive certain pension plan benefits. Judge Elfvin denied both parties' cross-motions for summary judgment on the issue of reformation of the release exception and scheduled a bench trial. After the bench trial, on March 5, 1992, 1992 WL 50924, Judge Elfvin rejected the reformation claim and directed the entry of judgment dismissing Healy's complaint.

## BACKGROUND

From 1961 until 1987 Healy was an employee and officer of Rich Products. He, his wife Joanne, and their children held thirty-six percent of the common stock of Rich Products as a result of gifts of stock made over the years by Joanne's father, Robert Rich, Sr. ("Rich"), Chairman and Chief Executive Officer of Rich Products. Rich at all times held voting control of the company. In the Fall of 1987, Joanne Healy, on the advice of her counsel, Francis J. McConnell, refused to sign a Buy–Sell Agreement and a Shareholder Agreement submitted to her by her father. The agreement contained voting and transfer restrictions on her Rich Products stock that were designed to insure that the company would remain under the control of the Rich family. Joanne Healy's refusal to sign these agreements resulted in a rift between Rich and the Healy family, culminating in Thomas Healy's resignation in December 1987.

At the time of his resignation and since 1978, Healy was a participant in two benefit plans provided by Rich Products: a Deferred Compensation Agreement (the "DCA") and an Incentive Compensation Plan (the "ICP") (collectively the "Plans"). He also was a participant in a 401(k) pension plan, which is not at issue here. Pursuant to the terms of the DCA, Healy was entitled to certain annual benefits for fifteen years following his retirement, disability, death or other termination of employment. The ICP, also known as the phantom stock plan, provided that Healy would periodically be awarded "units," each of which entitled him to future payments based on the company's book value, divided

by 1,000,000. Healy was to receive payments upon his retirement, disability, death or other termination of employment. The ICP benefits were to be paid annually for ten years, and an administrative committee was formed to oversee the distribution of payments. Both Plans contained "no-competition" provisions, the violation of which could result in forfeiture or suspension of benefits. Under the DCA, participants agreed not to compete with Rich Products for two years following the termination of employment. The ICP prohibited competition for an unlimited period of time. Both Plans also provided that the benefits were not subject to assignment, alienation or encumbrance.

In the Spring of 1988, after his resignation, Healy received the first installment of benefits due under the DCA—$44,615, and the first installment due under the ICP—$30,564. After these initial payments, $624,610 under the DCA and $275,076 under the ICP remained to be paid. Healy was paid $281,053 from the 401(k) pension plan in a lump sum upon his resignation.

In May 1988, Jonathan Golden, Rich Products' attorney, contacted McConnell to propose an immediate buy-out of the Healys' Rich Products stock and related interests. After extended negotiations, the parties ultimately agreed that Rich would pay twenty-five million dollars for the Healys' interests. Prior to the drafting of the agreement, a question arose concerning the earnings of certain Subchapter–S corporations in which the Healys owned shares of stock. The shares were scheduled to be transferred as part of the agreement. The earnings of these corporations had not been distributed to any of the stockholders, and the Healys' share of undistributed earnings amounted to $134,821.43. Although Rich was adamant about paying "twenty-five million dollars and not one cent more," Healy inquired as to whether his family's share of such earnings would be paid despite the Purchase Agreement. Rich initially refused. However, Golden explained that even if Rich refused to pay the Healys their shares of the distributions, the Healys' pro rata share of the distributions would be imputed to them as taxable

income. Thus, the Healys would incur a tax liability of twenty-eight percent of the earnings, effectively reducing the twenty-five million dollar purchase price. Considering these facts, Rich agreed to pay an additional amount equal to the tax liability of the Subchapter–S corporations attributable to the Healys.

Golden prepared the first draft of the Purchase Agreement and transmitted it by facsimile to McConnell on August 9, 1988. The draft included a provision for the execution of a General Release, releasing Rich Products from any and all liabilities and claims. Healy testified that after he reviewed the first draft, he specifically told McConnell that he wanted to make it very clear that he did not want to release his benefits under the Plans. McConnell testified that he advised Golden that Healy did not want to release his remaining benefits or continuing benefits under the Rich Products pension and profit-sharing plans. McConnell testified that when Golden asked which plans McConnell was referring to, he replied by describing in detail both plans and the specific amount of benefits available to Healy under each plan. He told Golden that Healy already had received the first installment under each plan. McConnell's testimony is supported by the contemporaneous notes he wrote in the margin of the draft: "not waiving continuing pension benefits, 15 years and profit-sharing, early retirement." McConnell further testified that although he did not specify the Plans by name when he first proposed an exception to the General Release, he identified both plans by name to Golden in a later conversation relating to the second draft of the agreement. Golden testified that, as part of the conversation about the first draft, "in general terms, [McConnell] said that he wanted an exclusion or an exception from the general release that was provided in the agreement for Tom for vested pension and profit-sharing benefits, or some such language as that." Golden, however, testified that he did not even know of the Plans' existence and denied that McConnell ever informed him of the Plans. Golden believed McCon-

nell's request for a release exception was "purely legal in nature" and related to ERISA plans that by law could not be forfeited, such as the 401(k) plan. He said that he did not believe they were dealing with "a controversial subject."

Pursuant to McConnell's request, Golden revised the General Release to include the following exception:

> except, with respect to Mr. Healy, any vested rights under any profit sharing or pension plans of Rich which are subject to the Employee Retirement Income Security Act of 1974, which benefits are not released....

McConnell had suggested the language "vested pension and profit sharing." Golden added the phrase "subject to" ERISA, since he believed McConnell was referring to ERISA-covered plans. McConnell was satisfied with the exception language because he "thought the exception was broader, in fact, than what I'd asked for, because it said any Rich[ ] vested benefits under any Rich pension or profit-sharing plan, subject to ERISA."

The Purchase Agreement was executed on August 15, 1988. The agreement outlined the stock and other interests being acquired and included Schedule I, which listed each of these interests and their aggregate prices, totalling twenty-five million dollars. Schedule I did not list Healy's pension benefits and their value in the asset breakdown.

After the closing date in August 1988, Healy sent to a Rich Products administrator executed change-in-beneficiary forms for the Plans but received no reply. In March and April 1989, Healy's benefits due under the ICP and the DCA were not paid as they had been paid in the prior year. On June 2, 1989, McConnell wrote to Golden, advising him that Healy had not received his pension benefits and requesting that the payments be made. Golden responded by informing McConnell that, by the terms of the Purchase Agreement and the General Release, Healy's benefits had been released and his pension rights extinguished.

In November 1989, Healy filed a complaint in an action to declare that Rich Products had breached its obligation to pay his benefits under the Plans. Healy asserted that those benefits had been preserved by the release exception. Alternatively, Healy sought reformation of the release clause to restore his pension rights on the basis of either mutual mistake or fraud. Healy moved for summary judgment on his claim that, pursuant to the language of the release exception, he was entitled to his Plan benefits. Rich Products filed a motion to dismiss the complaint and a cross-motion for summary judgment on all issues. Healy then cross-moved for summary judgment specifically on his claim for reformation based on mutual mistake and fraud.

In an order entered on April 1, 1991, the district court found that the DCA and ICP were subject to ERISA generally, but, as "top-hat" plans, were exempt from the substantive vesting requirements set forth in 29 U.S.C. § 1053. Since the Plans were exempt from ERISA's vesting requirements, the court found the "no-competition" forfeiture clauses to be permissible. Citing 29 U.S.C. § 1002(25), the court concluded that "where forfeiture clauses are permissible, no vesting of rights can occur." The court, therefore, held that "giving the words of the General Release their plain meaning [under ERISA,] the release of liability [for "vested" benefits] does not except benefits under the DCA and the ICP." Thus, the district court granted Rich Products' motion for summary judgment on the claim that the release exception did not preserve Healy's pension rights. The court denied Healy's and Rich Products' cross-motions for summary judgment on the reformation claim and directed the parties to appear for an evidentiary hearing on that issue.

On March 5, 1992, after the evidentiary hearing, the district court dismissed Healy's reformation claim. Judge Elfvin rejected the mutual mistake claim. He found that Healy failed to show by clear and convincing evidence that either Rich Products or Healy was mistaken in regard to the exception clause. Judge Elfvin also

found that Healy failed to prove his fraud claim because he did not show that he was justified in relying on Golden's statement that he would provide for a release exception to protect Healy's vested benefits. On appeal, Healy claims that the district court erred in granting summary judgment rejecting his contract claim. Urging only a theory of mutual mistake, he claims that the district court also erred in rejecting his claim for reformation after trial.

## DISCUSSION

### 1. *The Contract Claim*

■ On appeal of a grant of summary judgment, we determine *de novo* whether there is a genuine issue of material fact and whether the moving party properly was entitled to judgment as a matter of law. *Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1071 (2d Cir.1992). "In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.' ... [T]here may not be any genuine issue regarding the inferences to be drawn from the language.... [T]he inferences ... may not be reasonably susceptible to having more than one meaning ascribed to them." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir. 1990) (citations omitted).

■ The district court granted summary judgment for Rich Products upon finding that the language in the release exception, as defined by the ERISA statute, did not preserve Healy's pension benefits. The court identified each plan as a "top-hat" plan, which is defined by ERISA as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees...." 29 U.S.C. § 1051(2) (1988). Although "top-hat" pension plans are exempt from ERISA's vesting requirements, *id.* § 1051, the district court looked to the ERISA statute to define the term "vested." ERISA defines "vested" as

"nonforfeitable," which is further defined as "unconditional." *See id.* §§ 1002(25), 1002(19). Judge Elfvin reasoned that, because the Plans were subject to forfeiture for breach of their "no-competition" clauses, they were not "nonforfeitable," and therefore not "vested" and not encompassed by the release exception.

Healy asserts that Judge Elfvin erred in applying ERISA's nonforfeitability requirements to define the term "vested," since ERISA does not "preclude the creation of vested, yet forfeitable, rights under employee benefit plans that, like the DCA and ICP, are not subject to those requirements." *See id.* § 1051(2). Under the ordinary meaning of the term, Healy argues, the Plans are indeed "vested" because he has satisfied all of the conditions required for receipt of benefits and, in fact, had already begun receiving those benefits. Thus, Healy characterizes his plans as "vested," subject to divestment in the event of a violation of the Plans' respective "no-competition" provisions. Healy also notes that by the time the district court rendered its decision, he had been retired from Rich Products for over two years. The DCA's two-year "no-competition" provision had therefore expired, and his benefits under that plan were no longer subject to forfeiture. Rich Products asserts, however, that the district court properly applied the ERISA definition of "vested" and refers to Golden's testimony that when McConnell used the term "vested," he "thought [McConnell] was talking about ERISA."

We find no support for Judge Elfvin's conclusion that "vested" as used here is defined by ERISA. Because the parties ascribe different meanings to the term "vested," and there is no clear indication in ERISA how the term should be defined with respect to these Plans, the district court must interpret the language of the release exception without reference to the ERISA statute. The meaning of "vested," as it is used in the General Release, must be ascertained under the customary principles of contract interpretation.

### 2. *The Reformation Claim*

A "mutual mistake" occurs when "both ... parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent." 21 N.Y.Jur.2d *Contracts* § 121 (1982). A "unilateral mistake" occurs when "only one of the parties to a bilateral transaction is in error." *Id.* To reform a contract, mutual mistake must be established by clear and convincing evidence. *Seebold v. Halmar Constr. Corp.*, 146 A.D.2d 886, 536 N.Y.S.2d 871, 872 (3d Dep't 1989). Unilateral mistake alone will not justify reformation of an instrument. *Alden Auto Parts Warehouse, Inc. v. Dolphin Equip. Leasing Corp.*, 682 F.2d 330, 333 (2d Cir.1982).

A district court's findings with respect to the expression of the contracting parties' intent will not be disturbed unless they are clearly erroneous. *Marine Transp. Lines, Inc. v. International Org. of Masters, Mates & Pilots*, 878 F.2d 41, 45 (2d Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990). To prove mutual mistake, Healy was required to show that both he and Rich Products shared the same erroneous belief that the release exception protected Healy's Plan benefits. *See Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 105 (2d Cir.1990). Healy had to overcome a "heavy presumption that a deliberately prepared and executed [agreement] manifest[s] the true intention[s] of the parties," *George Backer Management v. Acme Quilting Co.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 139, 385 N.E.2d 1062, 1066 (1978), especially between counselled businessmen. *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 347, 489 N.E.2d 231, 234 (1986). Judge Elfvin concluded that there was no basis for reformation of the agreement, finding that Healy failed to prove either that the writing did not reflect the agreement reached by the parties or that Rich Products had perpetrated a fraud on him.

Finding that Healy and Rich Products did not share the same erroneous belief, Judge Elfvin determined that there was no mutual mistake:

> [I]t is far from clear that Golden and McConnell had agreed on anything except that Golden would include language in a draft which would create an exception for some sort of vested pension and profit-sharing benefits.... Golden may have thought that McConnell wanted one thing, when in fact he wanted something else.... If anything, such a situation would be a unilateral mistake—one party (McConnell) misconstruing the language of the writing. It would not be a mutual mistake—both parties agreeing to the same thing but failing to properly reduce such to writing.

Upon a review of the evidence, we conclude that the district court's factual findings regarding lack of mutual mistake are not clearly erroneous. Golden and McConnell offered conflicting versions of their understanding as to the scope of the release exception. Based on the testimony and other evidence presented, the district court properly could conclude that Healy had not met his burden of proving that the parties shared the same erroneous belief as to the meaning of the release exception. Therefore, Healy's claim for reformation properly was rejected.

In affirming the district court's ruling that Healy had not met his burden of proof as to reformation, we do not suggest a particular view of the parties' intentions. Rather, we remand this case for a re-examination of the meaning of the term "vested" under general principles of contract construction, which may include extrinsic evidence should the district court find it necessary.

### CONCLUSION

The judgment of the district court is vacated and the case remanded for further proceedings consistent herewith.