John P. **BIGDA**, Plaintiff,

v.

**FISCHBACH CORPORATION,**
Defendant.

No. 92 Civ. 2226 **(RLC).**

United States District Court,
S.D. New York.

June 8, 1995.

Andrew S. O'Connor, New York City, for Plaintiff.

Patterson, Belknap, Webb & Tyler, New York City, (Ellen M. Martin, of counsel), for Defendant.

## *OPINION*

ROBERT L. CARTER, District Judge.

Plaintiff, John Bigda, alleges the breach of his employment agreement and the termination of the stipulation of settlement entered into between defendant Fischbach Corporation ("Fischbach") and Victor Posner which, while allowing Posner to gain control of Fischbach, sought to bar his interference with the company's management and operations. In his first cause of action, Bigda seeks liquidated damages consisting of $601,-377, an amount equal to three times plaintiff's annual salary; $112,661, the present value of three additional years of credited service; $7,644, the cost of the continuation for three years of plaintiff's health insurance benefits; and the legal fees and expenses incurred as a result of the termination of the employment agreement. In his eighth cause of action, he seeks a declaratory judgment that the forfeiture clause of the Senior Executive Benefit Plan is unenforceable.[1]

Defendant contends that Bigda's claims should be dismissed because the employment agreement has not been breached; that in any event Bigda continued to perform under the contract up to and after he terminated the employment agreement on October 3, 1990; that the liquidated damages provision in the employment agreement constitutes a penalty and is therefore unenforceable; and that plaintiff is guilty of breaches of good faith. Moreover, defendant contends that plaintiff is liable for breach of fiduciary duty extending from May 1989, to December 31, 1991 inclusive, entitling defendant to damages on its counterclaim in the amount of $519,701.76, the equivalent of the salary paid to him by Fischbach during the period in question.

## I. Background

The background facts in this controversy preceding those at issue at this stage of the proceedings have been detailed in the court's April 19, 1994 opinion, reported at 849 F.Supp. .895, with which familiarity is assumed, and will be repeated here only as is necessary for clarity and understanding of the current disposition.

In 1980, Victor Posner, who had already gained considerable notoriety as a corporate rapist, began to purchase Fischbach's outstanding stock through Pennsylvania Engineering Corporation ("PEC"), one of the companies Posner controlled. To ward off a takeover, Fischbach and PEC entered into an agreement limiting the percentage of outstanding stock PEC and its allies could acquire. In 1984, Posner and his allies brought suit in Florida to set aside the limiting agreement. In January, 1985, the dispute was resolved in a stipulation of settlement that gave ultimate control of the company to Posner but sought to rein in that control by keeping full operational responsibility and authority in the hands of those who had managed the company before Posner's intrusion. In particular, it was stipulated that Alfred R. Manville would remain as President and CEO of Fischbach, that he would provide for management continuity, and that

---

1. All of plaintiff's other causes of action have been disposed of through summary judgment, have been settled, or have been withdrawn by plaintiff.

he would designate a successor. Certain employees were given five-year employment contracts providing them with job security and generous prerogatives and entitlements if their employment agreements were breached or terminated. Plaintiff was the recipient of one of those employment contracts, and his agreement, dated October 25, 1985, is the focus of this litigation.

Once in control, Posner repudiated the stipulation. He dismissed the Manville people from the Board, refused to honor the commitment to appoint Manville's designated successor, Edwin Wilinski, as CEO, and took over Fischbach's bank accounts. Under Posner's five-year stewardship, the defendant accumulated enormous debt and came close to collapse.

In November, 1989, American Insurance Group ("AIG") entered into an option agreement with Posner to buy out his shares in Fischbach. On July 17, 1990, AIG acquired 94.9% of Fischbach's stock. On August 15, 1990, Fischbach became a subsidiary of AIG. Plaintiff remained an employee of Fischbach until December, 1991.

By letter dated October 3, 1990, however, plaintiff terminated the October 25, 1985 employment agreement, and he brings this action to secure various entitlements specified in the agreement. Initially, Bigda sought to recover for breaches occurring during the Posner regime as well as those which took place after the AIG takeover. In its April 1, 1994 opinion, the court held that plaintiff had no cause of action for breaches during the Posner era on the grounds that Bigda had elected to continue performing under the agreement and could not now sue for its breach. *Bigda v. Fischbach Corporation,* 849 F.Supp. 895, 901 (S.D.N.Y.1994) (citing *Filmline (Cross–Country) Prods., Inc. v. United Artists Corp.,* 662 F.Supp. 798, 805 (S.D.N.Y.1987) (Sprizzo, J.), *aff'd,* 865 F.2d 513 (2d Cir.1989)). Summary judgment was granted to defendant on all matters relating to the Posner era, but the court allowed Bigda to present evidence at trial regarding breaches that may have occurred during the AIG era, reserving judgment regarding whether he had elected to continue his contract during that era as well. *Id.* These issues, along with defendant's counterclaim, were tried to the court and are now the focus of inquiry.

## II. Breaches of the Employment Agreement

After its takeover, AIG installed Donald Brenner as President and Chief Executive Officer ("CEO") of the company. On assuming office, Brenner met with the staff and invited each of them to meet with him privately to discuss their personal situations. Bigda sought to meet with Brenner for this discussion, but according to Bigda's testimony, the meeting never took place.

Brenner distributed a questionnaire to the employees requesting them to list their duties, functions, reporting responsibilities and critical matters needing his immediate attention. Plaintiff responded, describing his duties as Secretary and General Counsel as being

> responsible for all Secretarial and legal matters, including litigation, involving the Corporation and its subsidiaries. I direct the activities of scores of law firms throughout the country in the handling of our litigation and other legal matters. I am an officer and director of all subsidiaries; Security Clearance Officer for the Fischbach facility here at 485 Lexington Avenue; and Anti–Trust Compliance Counsel for F & M [a subsidiary of Fischbach] under its agreement with the Dept. of the Army.

(Pl.Ex. 25.)

Plaintiff identified the following as critical matters needing Brenner's immediate attention: implementation of the merger and formation of Fischbach/Natkin Associates (*see* discussion *infra* at 1009); delisting of the company's common stock on the N.Y.S.E.; deregistration by the S.E.C.; claims by DWG (a Posner company), Posner and the Manville estate; settlements of lawsuits by Aetna and Travelers Insurance Company ("Travelers"); the Florida lawsuit; anti-trust litigation; and legal matters arising in the normal course of business. (Pl.Ex. 25.) In addition, he listed as important the designation of outside counsel and his continued employment. (*Id.;* Tr. at 101–02.) Brenner

never replied to this communication or met with plaintiff on any of these matters. Some of these matters were handled without consultation with plaintiff by third parties or employees in whose selection or designation plaintiff played no part.

When AIG acquired Fischbach, negotiations were taking place between AIG and Peter Kiewitt & Sons ("Kiewitt") to form a joint venture to which some of Fischbach's assets would be sold. In anticipation of the joint venture, a new company, Fischbach/Natkin Associates ("NEWCO"), was incorporated. In early September, 1990, a meeting was held in Denver, Colorado to usher in the new enterprise. The plaintiff was invited to attend this meeting but declined to do so. At that meeting, an organizational chart of NEWCO was distributed showing another lawyer, Tom Shea, as reporting to NEWCO's chief operating officer, making Shea general or chief counsel of this new company. On September 13, 1990, after seeing the chart, Bigda faxed the chart to Richard D'Alessandri, an AIG attorney, along with an inquiry as to whether he had been replaced as Fischbach's General Counsel. D'Alessandri responded by phone, explaining that the chart referred to NEWCO and that Bigda would continue as Fischbach's General Counsel. (The joint venture never came to fruition and NEWCO was abandoned shortly after the Denver meeting.)

On September 14, 1990, Bigda again wrote to D'Alessandri, inquiring whether AIG would be interested in extending his employment agreement. (Tr. at 438–39.) As a result of this letter, Bigda met with D'Alessandri, Brenner and Mark Reagan, a senior AIG executive dealing with Fischbach issues, on September 26, 1990. Reagan presented a proposal for Bigda's continued employment. Bigda stated that he believed that he had a cause of action for breaches of his employment agreement by Posner which would enable him to secure termination benefits. The other parties did not wish to talk about that. Bigda said that other employees, for example Robert Niehaus, former Acting President of Fischbach, were receiving or had received better deals than the one that was being proposed for him. Reagan told him to think

about what was being proposed for him, and the meeting ended. (Tr. at 722–23.) On October 2, 1990, Bigda wrote to D'Alessandri regarding severance pay. On October 3, 1990, he sent a letter, addressed to the chairman of Fischbach, terminating his contract. At the time, Fischbach had no chairman, and the termination letter was received by the company's receptionist. Bigda continued to report to work until late December, 1991. Current Fischbach management did not become aware of the termination letter until Patricia Moore, Chief Administrative Officer to John Kiley, the new CEO of Fischbach, met with Bigda in December, 1991, to discuss a severance package. (Tr. at 765–66.)

Under the terms of Bigda's employment agreement, which extended for five years from October 25, 1985, Bigda was to perform the same services that he performed immediately prior to the agreement; his base salary was set at $133,000 annually, with a yearly percentage increase; he was entitled to participate in a bonus program for senior executives; vacations were to be afforded of at least the same duration as had been afforded immediately prior to the agreement; and he was to be included in the benefit programs that were provided for most senior executives, including the pension plan, hospitalization, health and life insurance, group dental insurance, and the disability plan.

In the event that Bigda was removed from any of his positions or that his responsibilities or authority were curtailed or diminished and the breach continued for ten days after written notice from him of the breach, Bigda had the option of either terminating his services or terminating the agreement. If he elected to terminate his services, he was then entitled to all compensation and other payments and benefits provided under the agreement.

If Bigda elected to terminate the agreement, he was then entitled to receive all compensation to the date of termination, plus the equivalent of three years salary and bonuses; legal fees and expenses incurred in seeking to enforce the rights specified in the agreement; continued benefit programs for three years after termination; and three additional years of credited service under the

pension plan. Moreover, there was no requirement to mitigate damages.

When AIG took over in August, 1990, Fischbach was a shell of its former self, emptied of its cash reserves, heavily in debt to its creditors, and involved in many lawsuits which exposed the company to a potential liability of many millions of dollars. AIG sought to reduce Fischbach's exposure through negotiation with Fischbach's creditors and litigants. In handling the merger with Fischbach and in seeking to reduce the company's financial liabilities, AIG engaged people (lawyers and employees) to accomplish this task, without consulting plaintiff, although he was advised of what was going on. While these matters were theoretically Fischbach's business, it was AIG's funds and assets that were to be used to satisfy Fischbach's obligations and the claims against it in the effort to restore the corporation to good health. AIG chose the firm of Kaye, Scholer, which had represented it in the acquisition of Fischbach, to reach agreements with Westinghouse, BAII, Posner and DWG, settling roughly some $80 million of Fischbach's indebtedness. Settlement of the Aetna and Travelers lawsuits was reached for about $39 million. D'Alessandri worked out a settlement of the lawsuit Wilinski had brought for breach of his employment agreement and negotiated an agreement with Coudert Brothers to keep them from withdrawing as counsel for Fischbach in ongoing anti-trust litigation because of nonpayment of the firm's fees, which had grown to $3 million.

Fischbach's survival was at risk, and without the steps AIG took to handle these outstanding matters, the company could not have survived. I am not convinced that these acts, accomplished without Bigda's involvement, constituted breaches of his employment agreement. Indeed, there is only Bigda's word as to the extent and scope of his responsibility and authority as General Counsel prior to the Posner takeover. Nor am I at all certain that Bigda's version of the scope of his authority during that period is reliable or credible. There is some evidence that his authority to appoint outside counsel was subject to Board approval and that his decisions on legal matters were seconded by

Wilinski. Moreover, with over a hundred million dollars involved, I seriously doubt that before the Posner takeover Bigda would have had the unfettered authority he claims he had to decide on the selection of people to do what had to be done. However, there has been no effort to seriously challenge him regarding the scope of his duties. Accordingly, the court will assume in deciding the breach of contract issue that Bigda's authority and responsibility were as far-reaching in scope and independence as he asserts.

Bigda points to the following as instances of diminution of his authority in violation of the employment agreement: Brenner's handling of the termination of Robert Niehaus, acting president of Fischbach, without consulting plaintiff, (Tr. 107–11); Bigda's not being consulted about the Aetna, Travelers, BAII, Westinghouse, Posner, and DWG settlements and not being involved in selecting outside counsel to deal with these matters; his not being allowed to handle the delisting on the N.Y.S.E. or the deregistration with the S.E.C.; D'Alessandri's negotiating with Coudert Brothers without consulting or involving Bigda; and D'Alessandri's settling of the Wilinski law suit and the Manville estate claim without consulting or involving plaintiff. (Tr. at 117, 130–140.) Brenner never discussed any of these matters with plaintiff and did not respond when Bigda wrote to him about current legal issues facing the company. (Tr. at 132, 133.) These incidents occurred in August, on the heels of Fischbach becoming a subsidiary of AIG. Bigda also cites as a diminution of his authority the fact that after Fischbach was merged with AIG, new by-laws were prepared for the corporation without his being consulted or otherwise involved in the matter.

In early September, 1990, plaintiff brought to Brenner's attention the threatened withdrawal of Coudert Brothers as counsel in pending anti-trust litigation unless their long overdue legal fees were paid promptly. He received no response and learned subsequently that Brenner had referred the matter to D'Alessandri, who had made direct contact with Coudert Brothers and reached an accommodation about payment of their fees and their continued representation of

Fischbach. Bigda regarded Brenner's referral to D'Alessandri and the latter's negotiating with Coudert Brothers on his own as a diminution of his authority and thus a breach of the employment agreement. (Tr. at 133–36, 701, 727.) On September 6, 1990, Bigda wrote to Brenner about overdue fees for outside counsel handling a matter for the company. He received no response. (Tr. at 137.)

On September 11, 1990, plaintiff wrote to Brenner about possible controversy with the Justice Department because of some unresolved litigation. No response was forthcoming. D'Alessandri then called plaintiff to ask him to alert Stephen Hogan of Coudert Brothers to a conference call D'Alessandri intended to have with Hogan, the Justice Department and a fourth party regarding resolving the litigation as desired by the Justice Department. Hogan prevailed on D'Alessandri to not make the call. Plaintiff considered it his responsibility to handle this matter.

On September 13, 1990, Bigda wrote to Brenner seeking direction concerning the potential sale of John Miller Electric company, a wholly owned subsidiary of Fischbach. He received no response. (Tr. at 139.) On September 14, 1990, Bigda wrote to Brenner concerning the possible liquidation of Fischbach and Moore Incorporated (Fischbach and Moore), another Fischbach subsidiary. Again, he received no response. (Tr. at 140.)

Bigda contends that the way he was treated by Brenner and D'Alessandri during August and September, as indicated above, deprived plaintiff of

> his authority to assess the problems, to determine how best they should be handled, to handle them himself, to hire outside counsel of his own choice to handle them, if necessary, to participate in the negotiation of such settlements, to prepare the necessary documentation, and to report to his superiors in connection therewith. It is an obvious curtailing and diminishing of his duties, authorities, responsibilities, position and status....

(Pl.'s Post–Trial Mem. at 31.)

As Secretary of the corporation, Bigda prepared the minutes of the board and shareholders meetings, signed stock certificates, and performed all duties incident to the position of Secretary and whatever other duties were assigned to him by the Board. (Tr. at 96.) After the AIG takeover, he no longer had custody of the minute books of the Board and no longer functioned as Secretary because that role was assumed by D'Alessandri.

### III. Election of Remedies

■ During August and September, 1990, plaintiff did nothing about his grievances concerning the diminution of his responsibilities. He continued to perform his duties and to receive his paychecks until and even after the contract expired on October 24, 1990. (Tr. at 445–49.) In response to Brenner's request that the staff tell him what they believed needed his attention, Bigda listed, among other items, his continued employment. In mid-September, 1990, he raised the issue of his employment status with D'Alessandri, and he consequently met on September 26, 1990, with Brenner, Reagan and D'Alessandri regarding the terms of his employment beyond October 24, 1990, when the employment agreement was scheduled to end. See discussion at 5–6. These acts on plaintiff's part are fatal to his claim of breach of the agreement.

■ When a party materially breaches a contract, the non-breaching party must choose between two remedies—he can elect to terminate the contract and recover liquidated damages or he can continue the contract and recover damages solely for the breach. *ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir.1991). A party can indicate that he has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party. *Id.; see also Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313–14 (Ct.Cl. 1976). Once a party elects to continue the contract, he can never thereafter elect to terminate the contract based on that breach, *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1196 (S.D.N.Y.1994) (Leisure, J.), although he retains the option of terminating the contract based on other, subse-

quent, breaches. *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 563 (2d Cir.1969). Since Bigda continued to collect his paychecks and perform his duties until he left the company in December, 1991, entered into negotiations on September 26, 1990 regarding the continuation of his employment, and indicated to Brenner that he wanted his employment to continue, he elected to continue his contract in the face of all breaches that had occurred.[2]

■ Underlying the court's previous ruling precluding Bigda from recovering liquidated damages for breaches that occurred during the Posner era but allowing him to present evidence of new breaches that occurred during the AIG era is an assumption that each additional curtailment of Bigda's responsibilities constituted a new breach. The ruling thus rejected the notion, advocated by both Bigda and Fischbach at various points in their arguments, that it was the curtailment of Bigda's responsibilities as a whole that constituted the breach. (*See* Def.'s Response to Pl.'s Post–Trial Mem. at 16., Pl.'s Reply to Def.'s Post–Trial Mem. at 26.) For example, Bigda argues that the fact that even after some of the alleged breaches he continued to perform his duties as General Counsel and Secretary for Fischbach does not indicate that he elected to continue the contract, because

> [t]he breach in question is the curtailing and diminishing of his duties, authorities, responsibilities, position and status, and not the outright total extinguishment thereof. It is only when that curtailing and diminishing reaches a point where it amounts to a material breach that gives rise [sic] to the question of election.

(Pl.'s Reply to Def.'s Post–Trial Mem. at 26.) This argument is puzzling in light of plaintiff's statement that he "has established numerous serious breaches of the Agreement, each and all of which were grounds for termination of the Agreement under paragraph 7(a)." (Pl.'s Post–Trial Mem. at 68.) More importantly, this argument shirks the issue of whether, after the last breach upon which Bigda relies to support his termination of the

contract, he continued to perform his duties. The law is clear that since he did, he elected to continue the contract. *See* 5 Walter H.E. Jaeger, Williston on Contracts, 3d ed. § 688 at 302 (1961) ("The employee is entitled to choose between the prize of further employment with the pecuniary and other advantages that may flow from it, and the prize of freedom from his own liabilities under the contract. By continuing work he has manifested an intent to take the former...."); *Gorman Publishing Co. v. Stillman*, 516 F.Supp. 98, 111 (N.D.Ill.1980) (where employee continued to work for employer after employer's alleged anticipatory breach, he chose to continue the contract).

Bigda also argues that his acceptance of paychecks after the occurrence of some of the breaches cannot constitute an election to continue the contract because he "had the right to accept his paychecks for other work he was performing." (Pl.'s Reply to Def.'s Post–Trial Mem. at 25–26.) This argument ignores the very essence of the doctrine of election, which is that by accepting Fischbach's performance under the contract Bigda chose to continue the contract. *See ARP Films, Inc.*, 952 F.2d at 649 (holding that plaintiff's "decision to continue receiving benefits pursuant to the [contract] was tantamount to an election to affirm the contract"); *V.S. Int'l, S.A.*, 862 F.Supp. at 1196 ("Plaintiffs cannot elect to continue with the contract, continue to receive the benefits from it, and thereafter bring an action for rescission or total breach").

■ As plaintiff argues, the doctrine of election permits parties to wait a "reasonable time" after learning of the alleged breaches before terminating the contract. *Cities Serv. Helex, Inc.*, 543 F.2d at 1313. Plaintiff argues that the amount of time that is reasonable depends on the nature of the breach and that the type of breach that he is claiming "can only be ascertained and established by the cumulative effects which transpire in the course of one's employment." (Pl.'s Post–Trial Mem. at 70.) Therefore, he claims, he was entitled to wait several weeks after

---

**2.** Since the court finds that Bigda elected not to seek liquidated damages, it need not reach the merits of defendant's defenses that the liquidated damages provision constitutes and unenforceable penalty and that plaintiff breached his duty of good faith.

learning about the organizational charts before terminating the contract. *Id.* However, the operative factor in the election doctrine is whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he had made an election. Therefore, how much time is reasonable depends on the nature of the performance to be rendered under the contract. "Election to take advantage of breach of condition in a contract generally need not be exercised until the time arrives when, by the terms of the contract, the party entitled to elect must render some performance. Then either performing or failing to perform will indicate an election." 5 Williston on Contracts, *supra*, at 274. Since Bigda continued to perform his duties after learning of all of the breaches, he waited too long to exercise his option to terminate the contract based on the breaches.

■ Plaintiff seems to argue that although he waited several weeks after learning about the organizational charts before writing the letter that terminated the contract, he "reacted promptly" by communicating his objections and obtaining the September 26 meeting with Reagan and Brenner at which he discussed the breaches of the contract. (Pl.'s Post–Trial Mem. at 72.) Caselaw is clear, however, that where a party merely objects to an alleged breach but continues to perform and to accept the benefits of the breaching party's performance under the contract, he will have elected to continue the contract. *See V.S. Int'l, S.A.*, 862 F.Supp. at 1196 (holding that although plaintiff may have given defendant written notice and an opportunity to cure the breach, he did not terminate the contract and thus elected to continue it); *Filmline (Cross–Country) Prods., Inc.*, 662 F.Supp. at 805 (film distributor's "expressions of dissatisfaction with the ... screenplay did not constitute the written notice of default required by the contract" and were negated by distributor's subsequent performance); *Cities Serv. Helex, Inc.*, 543 F.2d at 1313 ("if performance continues and is accepted, the right to end the contract cannot be preserved even by explicit expression of intent").

■ Bigda asserts that he cannot be found to have elected to continue the contract after many of the alleged breaches because defendant has not shown that he was aware of those breaches. (Pl.'s Post–Trial Mem. at 68.) Of course, a non-breaching party cannot be found to have elected to continue a contract in the face of a breach unless he knew of the breach. However, since breaches could not form the basis for Bigda's termination of the employment agreement unless he had knowledge of them, Bigda has impliedly conceded that he knew of all of the breaches that are at issue here.

■ Defendant attempts to push the election doctrine to its outer boundary by arguing that because Bigda acquiesced in the curtailment of his duties during the Posner era he cannot now rely on those terms of his contract that he alleges were breached without first "advising Fischbach of the specific respects in which his contract was being breached, demanding strict performance and thereafter giving Fischbach a reasonable amount of time to conform to the contract." (Def.'s Post–Trial Mem. at 47.) This argument confuses the election doctrine with the waiver doctrine. Under the waiver doctrine, "a party may, by words or conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted for his benefit." *Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F.Supp. 821, 830 (S.D.N.Y. 1969) (Herlands, J.). Once a condition has been waived, "it can be restored by a reasonable notice demanding performance and stating that the contract will be rescinded if the notice is not complied with." *Id.* at 831 (quoting *Taylor v. Goelet*, 208 N.Y. 253, 101 N.E. 867, 868 (1913)). No waiver can have occurred here, however, because clause 11 of the employment agreement (the "non-waiver clause") states, "No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by Employee and an officer of Employer," and defendant has not produced a written waiver. Although Bigda elected to continue his contract instead of terminating it based on breaches that occurred during the Posner era, he did not waive any of his rights under the contract.

Bigda argues that because the non-waiver clause precludes waiver of his right to terminate his employment contract unless the waiver is written, the doctrine of election may not be applied here. This argument has already been rejected by this court on the grounds that an election is not a waiver of any rights under the contract but rather a choice between two inconsistent remedies for breach of the contract. *Bigda*, 849 F.Supp. at 901 n. 2; *see also* 5 Williston on Contracts, *supra*, at 275; *Apex Pool Equip. Corp.*, 419 F.2d at 562.

■ Although Bigda elected not to terminate his contract based on the breaches by defendant, and is therefore not entitled to liquidated damages, he has never lost his rights to seek an award of damages for the individual breaches. However, Bigda did not show that he suffered injury from any of the diminutions in his duties, so he is not entitled to an award of damages.

*IV. ERISA Preemption of State Causes of Action*

■ In its opinion of July 27, 1994 (the "July opinion"), reported at 858 F.Supp. 46 (S.D.N.Y.1994), the court granted plaintiff leave to amend his complaint to add an eighth cause of action seeking a declaration from the court that section 3 of the employment agreement is unenforceable under both New York law and ERISA to the extent that it subjects Bigda's benefits under the Fischbach Senior Executive Benefit Plan (the "Plan") to forfeiture, if, prior to the age of 65, plaintiff accepts employment that the Fischbach Board of Directors deems competitive with Fischbach or any of its subsidiaries. The court ruled that plaintiff's benefits plan fell into the category of unfunded plans maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated em-

ployees," 29 U.S.C. § 1051(2) (1988),[3] and was thus exempt from ERISA's nonforfeitability requirements. 29 U.S.C. § 1053 (1988). The court then concluded, based on its reading of the language of ERISA, that state law was not preempted. After plaintiff amended his complaint, defendant moved to dismiss the eighth cause of action on the grounds that state law was preempted by ERISA. The court reserved judgment on this issue until after the trial and now reconsiders its July ruling.[4]

■ The section of ERISA governing supersedure reads in part,

the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to *any employee benefit plan described in section 1003(a)* of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144 (1988) (emphasis added). Section 1003(a) provides,

*Except as provided* in subsection (b) of this section and *in sections 1051*, 1081, and 1101 of this title, this subchapter shall apply to any employee benefit plan if it is established or maintained—(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce. . . .

29 U.S.C. § 1003 (1988) (emphasis added).

Defendant argues that the language of the statute belies its intent and that an examination of the structure of ERISA as a whole and also of the legislative history reveals that even though top hat plans are exempted from § 1051 they are still governed by other sections of ERISA, and consequently state law

---

**3.** Plans falling into the category described in § 1051(2) are commonly called "top hat" plans. *Healy v. Rich Prods. Corp.*, 981 F.2d 68, 72 (2d Cir.1992).

**4.** Plaintiff argues that the court should adhere to the law of the case and refuse to reconsider this issue. "[T]he law of the case is, at best, a discretionary doctrine," *United States v. Birney*, 686 F.2d 102, 107 (2d Cir.1982), and pursuant to

Rule 54(b), F.R.Civ.P., this court retains the power to revise any of its orders "before the entry of final judgment." Plaintiff has not asserted that he would suffer any prejudice from a reconsideration of this issue, and since he has been allowed to fully brief this issue in his response to the motion to dismiss the eighth cause of action and in his trial memoranda, the court finds that he will suffer none.

is preempted. It argues further that although § 1144 seems to exempt all plans described in §§ 1051, 1081, and 1101, as well as the specific exemptions listed in § 1003(b), it actually means to include the plans described in § 1003(a)(1), (2) and (3) and to exempt only those plans described in § 1003(b).

ERISA regulates different types of plans to different degrees. Pension plans are regulated closely and are subject to controls over both their substance and the procedures they employ, while employee benefit plans are exempted from most controls over their content and thus are regulated less closely. *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 491 (2d Cir.1988); *see also* Peter J. Wiedenbeck, *Implementing ERISA: Of Policies and "Plans",* 72 Wash.U.L.Q. 559, 566 (1994). Top hat plans, which are a type of employee benefit plan for high-ranking employees, are exempted from all substantive provisions on the assumption that these employees have enough power to negotiate adequate plans for themselves and need only the information and enforcement protections of ERISA. *Barrowclough v. Kidder, Peabody & Co.,* 752 F.2d 923, 934 (3d Cir. 1985), *overruled in part on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,* 7 F.3d 1110 (3d Cir.1993); *Fasco Indus., Inc. v. Mack,* 843 F.Supp. 1252 (N.D.Ill.1994). More particularly, top hat plans are exempt from the participation and vesting coverage of ERISA, 29 U.S.C. §§ 1051–1061, the funding coverage, 29 U.S.C. §§ 1081–1086, and the fiduciary responsibility coverage, 29 U.S.C. §§ 1101–1114, but not from the reporting and disclosure provisions, 29 U.S.C. §§ 1021–1031, or the administration and enforcement provisions, 29 U.S.C. §§ 1131–1145. This distinction is evident from the fact that the first three categories contain specific provisions exempting top hat plans, 29 U.S.C. §§ 1051, 1081, 1101, while the last two do not.

It is the last category of protection, the administration and enforcement provisions, that is most important here, since it contains the supersedure provision, 29 U.S.C. § 1144. It is clear that the provisions of the administration and enforcement section of ERISA apply to top hat plans. For example, the provision providing a federal cause of action for violations of the terms of a plan applies to top hat plans. 29 U.S.C. § 1132(a); *Miller v. Eichleay Eng'rs, Inc.,* 886 F.2d 30, 37 (3d Cir.1989); *Rockney v. Blohorn,* 877 F.2d 637, 639–40 (8th Cir.1989); *Fasco Indus., Inc.,* 843 F.Supp. at 1255; *Carr v. First Nationwide Bank,* 816 F.Supp. 1476, 1487–88 (N.D.Cal.1993). It would be illogical for top hat plans to be subject to some of the administration and enforcement provisions of ERISA and not to others.

Furthermore, the goals underlying ERISA's preemption of state laws indicate that *all* plans covered by ERISA should be protected by preemption. The purpose of preemption is to ensure that all covered benefit plans will be governed by unified law, thus making it simpler for employers operating in several states to administer plans because "[a] patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 9–11, 107 S.Ct. 2211, 2216–17, 96 L.Ed.2d 1 (1987). There is no reason that top hat plans, unlike all other ERISA-covered plans, should be subject to a patchwork of different state laws.

Several courts have assumed that because ERISA governs some aspects of top hat plans, it also preempts state laws concerning them, although no court has squarely faced the problem that the language of §§ 1003 and 1144 seems to imply otherwise. *See, e.g., Pane v. RCA Corp.,* 868 F.2d 631, 635, 637 (3d Cir.1989); *Rockney,* 877 F.2d 637; *Northwestern Mut. Life Ins. Co. v. Resolution Trust Corp.,* 848 F.Supp. 1515, 1519 (N.D.Ala.1994). Likewise, several law review articles assume that ERISA preempts state laws regarding top hat plans. *See, e.g.,* Wiedenbeck, *Implementing ERISA,* 72 Wash.U.L.Q. at 592; Susan Katz Hoffman, *Nonqualified Executive Compensation Arrangements: Top–Hat and Excess Benefit Plans, in* Advanced Law of Pensions and Deferred Compensation 1349, 1356 (ALI–ABA Course of Study 1993); Susan G. Curtis, Richard G. Schwartz, *ERISA Coverage and COBRA Continuation Coverage, in* Un-

derstanding ERISA 1993: An Introduction to Basic Employee Retirement Benefits 473 (PLI Law & Estate Planning Course Handbook Series No. 340, 1993) [WESTLAW at 13].

The cases cited by this court in the 1994 opinion are not to the contrary. The court cites the Second Circuit's observation that "benefit plans that are themselves exempted from ERISA coverage are excepted from preemption," *Bigda*, 858 F.Supp. at 48 (citing *Stone & Webster Eng'g Corp. v. Ilsley*, 690 F.2d 323, 329 (2d Cir.1982), *aff'd sub nom. Arcudi v. Stone & Webster*, 463 U.S. 1220, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983)), but since top hat plans are subject to ERISA, *Miller*, 886 F.2d at 37; *Rockney*, 877 F.2d at 639–40, they are subject to preemption. In *Healy v. Rich Products Corp.*, 981 F.2d 68, the Second Circuit examined the meaning of "vested" as used in a top hat plan and concluded that because such plans are exempt from ERISA's vesting requirement, the meaning should be found not in ERISA's definition of the term but rather in the meaning intended by the parties, which should be ascertained under customary contract principles. *Id.* at 72. The court did not find that top hat plans were entirely exempt from ERISA; it merely observed that they were exempt from ERISA's vesting requirements. In *Sarnoff v. American Home Prods. Corp.*, 607 F.Supp. 77 (N.D.Ill.1985), *aff'd in part and rev'd in part on other grounds*, 798 F.2d 1075 (7th Cir.1986), the court did not find that the plan at issue was exempt from ERISA, it merely adhered to the parties' stipulation that the plan was exempt without voicing an opinion regarding the accuracy of the stipulation. *Sarnoff*, 607 F.Supp. at 79 n. 2. In effect, the court adhered to the parties' choice of law.

Having considered the language of ERISA, its structure, and the sparse caselaw regarding top hat plans, this court reverses its previous decision and holds that ERISA preempts state law causes of action regarding top hat plans.

*V. Cause of Action under ERISA*

■ The court ruled in its July opinion that since top hat plans are exempt from the nonforfeitability provisions of ERISA, 29 U.S.C. §§ 1051–1061, plaintiff has no cause of action under ERISA to challenge the forfeitability provision in his benefits plan. *Bigda*, 858 F.Supp. at 47. Nonetheless, plaintiff argues that "the strong public policy against forced forfeiture" indicates that a cause of action exists under ERISA under the federal common law. (Mem. in Opp'n to Def.'s Mot. to Dismiss Eighth Cause of Action at 5.) Plaintiff cites no precedent for the existence of such a federal common law cause of action, and his argument demonstrates ignorance of the structure of ERISA and of the role of federal common law in cases governed by ERISA.

■ Courts use federal common law to "fill in the interstices of ERISA's statutory scheme," *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1027 (2d Cir.1992), deciding claims that are allowed by ERISA but where ERISA does not provide substantive law. The failure of ERISA to provide nonforfeitability coverage to top hat plans is not an "interstice" because it is the result of a deliberate decision to let executives use their positions of power to negotiate such protection for their plans on their own. *See* discussion *supra* at 1015. Federal common law must further the purposes of the statute under which it is used; it may not be used "to re-write the federal statute." *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 14 (2d Cir.1993). Since ERISA intentionally omits top hat plans from its nonforfeitability protection, federal common law may not be used to create nonforfeitability protection under ERISA. As the court has already ruled, plaintiff's eighth cause of action does not state a claim under ERISA.[5]

*VI. Breaches of Fiduciary Duty*

■ Bigda had a fiduciary relationship with Fischbach in his capacities as its officer, employee, and attorney, *United States v. Pisani*, 590 F.Supp. 1326, 1337

---

5. Having dismissed plaintiff's eighth cause of action, the court need not reach defendant's request that the court reconsider its conclusion that plaintiff's eighth cause of action is not precluded by virtue of the court's dismissal of plaintiff's fifth cause of action.

(S.D.N.Y.1984) (Edelstein, J.) (employee owes fiduciary duty to employer; attorney owes fiduciary duty to client); *Condren v. Grace,* 783 F.Supp. 178, 182 (S.D.N.Y.1992) (Newman, J.) (attorney owes fiduciary duty to client), giving rise to a duty of loyalty. His duties of loyalty as an employee and as an officer prohibited him from appropriating corporate assets for his own benefit. *Matter of Greenberg,* 206 A.D.2d 963, 614 N.Y.S.2d 825, 827 (1994). His duty of loyalty as an attorney prohibited him from representing Fischbach in any matter in which his own interests might hamper the representation or would present an appearance that the representation would be hampered. *Condren,* 783 F.Supp. at 182.

Fischbach claims that Bigda violated his duty of loyalty from April, 1989 until December 31, 1991 by concealing his breach of contract claim against the company. Fischbach asserts that "although he was contemplating litigation against Fischbach no later than April 1989, when he prepared written work product for use against the Company in litigation, he told no one of his claim against the Company until after his employment was terminated." (Def.'s Post–Trial Mem. at 68.) For several reasons, this assertion is insufficient to establish liability for breach of duty of loyalty. First, at no point during Bigda's employment with the company did he commence litigation against the company. Therefore, at most, Bigda entertained thoughts of suing to enforce his contract rights. Mere thoughts, without action, cannot constitute a breach of a duty, and employees' pursuits of their contract rights cannot constitute disloyalty. *See Seymore v. Reader's Digest Ass'n, Inc.,* 493 F.Supp. 257, 264 (S.D.N.Y.1980) (Conner, J.) ("acts done in defense of an employee's contract rights ... are not insubordination and do not justify termination of employment"). Furthermore, although Fischbach asserts that Bigda terminated his contract surreptitiously and avoided informing anyone of the termination, Bigda sent his notice of termination by United States mail to the Chairman of Fischbach, as required by the employment agreement, a method which can hardly be called surreptitious.

Fischbach's second claim is that Bigda violated his duty of loyalty by misappropriating company documents for use in this litigation. Bigda kept a number of documents in his home which related to the alleged breaches of his contract, (Tr. at 506–7); some of these documents were confidential. (Tr. at 526.) Bigda took some of the documents from the office to read during his two-hour commute, and he took others to refer to in case company officials called him at home. (Tr. at 507–8.) Company documents are company property, and if Bigda had taken them to benefit himself he would have breached his duty of loyalty. *Diamond v. T. Rowe Price Assoc., Inc.,* 852 F.Supp. 372, 409–10 (D.Md.1994) (documents are company property); *see also Matter of Greenberg,* 614 N.Y.S.2d at 827 (corporate officer violated fiduciary duty by misappropriating tangible assets of corporation for his own interests). However, defendant failed to show that Bigda took the documents for any purpose other than to continue his work after he left the office, which hardly constitutes disloyalty.

Fischbach's third claim is that Bigda breached the duty of loyalty that he owed Fischbach in his capacity as its attorney by violating Disciplinary Rule 5–101 of the Code of Professional Responsibility, N.Y.Comp. Codes R. & Regs. tit. 22, § 1200.20 (1990), which reads, "Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property or personal interests." This rule embodies the attorney's duty of loyalty, which "precludes the attorney from having personal interests antagonistic to those of his client or from obtaining personal advantage or profit out of the relationship without the knowledge or consent of his client." *Condren,* 783 F.Supp. at 182. Fischbach asserts that Bigda represented Fischbach in breach of contract claims brought against the company by James Walker and Stanley Shaughnessy, former Fischbach employees whose employment agreements were similar to Bigda's, and that any advice that Bigda gave regarding those claims was thus self-interested. Bigda as-

serts in his defense that Bigda's breach of employment contract claim was different from the claims of these other employees and that Fischbach was aware of Bigda's employment claim from the moment that he sent his termination letter. The court need not address Bigda's defenses, however, because it finds no evidence that Bigda ever used his professional judgment on behalf of Fischbach in connection with these two matters.

In January, 1991, Bigda wrote a memorandum in which he addressed the company's ability to defend itself against a possible lawsuit by Walker. (Tr. at 476–77.) Defendant asserts that Bigda breached his fiduciary duty by giving advice to the company regarding this matter. However, Bigda wrote this memorandum to "The File," and defendant presented no evidence that anyone besides Bigda ever saw or used it. (Tr. at 476–77.) Bigda did not breach any duties by simply writing down his thoughts, without sharing them with anyone.

Defendant also asserts that Bigda breached his fiduciary duty by discussing his evaluation of Walker's claim with Chief Administrative Officer Patricia Moore. However, the entirety of that conversation, as related by the plaintiff, was:

> I simply told Ms. Moore of the conversation that I had with Mr. Walker in the spring of 1990 at which he asserted that he believed that his employment agreement had been breached, and I told her that I told Mr. Walker in that conversation that I didn't agree with him, I didn't believe that his agreement was breached.

(Tr. at 541–42.) Simply relating the substance of a conversation does not constitute giving legal advice that could be tainted in any way by Bigda's own interest.

Shaughnessy was the former president and CEO of Fischbach and Moore, a subsidiary of defendant. During his employment, he borrowed $150,000 from Fischbach & Moore in exchange for a mortgage on his home. In September, 1989, he sent a letter to defendant terminating his employment contract, and he ceased working for defendant the following month. In 1991, Shaughnessy defaulted on the mortgage note. Ed Lopategui, Secretary and Treasurer of Fischbach &

Moore, then wrote to remind Shaughnessy that the loan was due and received in response a letter warning that defendant owed Shaughnessy far more in liquidated damages than Shaughnessy owed on the loan. Bigda reported this exchange of letters to Kiley, the new CEO of Fischbach. Nonetheless, defendant sued to collect the $150,000, and in August 1991, in the course of that lawsuit, Shaughnessy filed a crossclaim seeking the liquidated damages for breach of his employment contract. (Tr. at 479–88.)

Fischbach claims that because Bigda intended to file a claim for liquidated damages based on similar grounds, and because if the defendant took any action to collect on the mortgage note Shaughnessy could be expected to pursue his liquidated damages claim, Bigda breached his fiduciary duty by being involved in deciding whether to attempt to collect on the note. Defendant bases its assertion that Bigda was involved in the decision-making process on two grounds, neither of which is convincing. First, defendant points to the fact that Bigda did not warn Lopategui not to write to Shaughnessy about the overdue loan. However, there was no evidence presented at trial establishing that Lopategui asked Bigda for advice prior to sending the letter or even that Bigda was aware that Lopategui was going to send the letter. Second, defendant points to Bigda's conversation with Kiley, but defendant did not show that Kiley ever asked Bigda for his opinion regarding whether or when Fischbach should sue on the note. On the contrary, Bigda's role was merely to report on the status of the case. In the absence of evidence that Bigda was asked for or gave advice regarding the Shaughnessy claim, there is no basis for a finding that he breached his fiduciary duty.

Defendant also claims that Bigda breached his fiduciary duty by acting as in-house counsel on the Shaughnessy case. However, the case was handled primarily by outside counsel, and Bigda's involvement was minimal. At most, he discussed with outside counsel their evaluation of the merits of Shaughnessy's claim. (Tr. at 488–94.) There was no evidence presented at trial, however, that during the course of this conversation Bigda

offered advice to the outside counsel or even ventured his own opinion regarding Shaughnessy's case. Therefore, the court cannot find that he breached any fiduciary duty. Defendant also claims that Bigda interfered with the Shaughnessy case by failing to comply with outside counsel's request for documents to use at depositions, but since Bigda left the company shortly after the document request was sent, this claim is not plausible. (Tr. at 545–46.)

## VII. Order

Plaintiff is denied recovery of liquidated damages on his first cause of action, and he is denied the declaratory judgment that he seeks in his eighth cause of action. Defendant is denied recovery on its counterclaim.

**IT IS SO ORDERED.**