**Edward E. LUCENTE, Plaintiff– Appellee–Cross–Appellant,**

**v.**

**INTERNATIONAL BUSINESS MA- CHINES CORPORATION, Defen- dant–Appellant–Cross–Appellee.**

**Docket Nos. 01–7857, 01–7993.**

United States Court of Appeals, Second Circuit.

Argued: June 5, 2002.

Decided: Nov. 4, 2002.

---

Peter T. Barbur, Cravath, Swaine & Moore, New York, N.Y. (Donald J. Rosenberg, Theresa K. Mohan, International Business Machines Corporation, White Plains, NY, of counsel), for Defendant–Appellant–Cross–Appellee.

Douglas L. McCoy, Hand Arendall, L.L.C., Mobile, AL (David R. Quittmeyer, on the brief), for Plaintiff–Appellee–Cross–Appellant.

Before: KEARSE and McLAUGHLIN, Circuit Judges, and DANIELS, District Judge.*

McLAUGHLIN, Circuit Judge.

IBM appeals from a decision of the United States District Court for the Southern District of New York (McMahon, *J.*) granting summary judgment to Edward E. Lucente on his breach of contract claim and dismissing IBM's breach of contract counterclaim. IBM contends that the district court's action was improper principally because there are disputed issues of fact regarding Lucente's departure from IBM. IBM also challenges the district court's grant of leave to Lucente to amend his Complaint, as well as the court's method of calculating damages. In his cross-appeal, Lucente challenges the district court's damages calculation.

Because the district court inappropriately resolved numerous issues of material fact in Lucente's favor and abused its discretion in granting Lucente leave to amend his Complaint, we reverse.

## BACKGROUND

### I. *Facts*

This being an appeal from a grant of summary judgment to Lucente, we view the deposition testimony, affidavits, and documentary evidence in the light most favorable to IBM, the non-moving party. *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 165 (2d Cir.2001).

Plaintiff worked for IBM for about thirty years before he retired in February 1991. When he retired, Lucente was the President of IBM's Asia Pacific Division, based in Tokyo, and he reported directly

---

* The Honorable George B. Daniels, United States District Judge for the Southern District of New York, sitting by designation.

to John Akers, IBM's Chief Executive Officer ("CEO").

## A. Lucente's Restricted Stock and Stock Option Awards

During his tenure at IBM, Lucente participated in several incentive compensation plans, including the 1982 Variable Compensation Plan (the "1982 Plan") and the 1989 Long–Term Performance Plan (the "1989 Plan") (collectively, the "Plans"). Under these Plans, IBM awarded Lucente stock options and restricted stock as part of his compensation. These Plans, of course, were designed to retain key executives and to give them a proprietary interest in the company by linking their compensation to IBM's profitability and growth. For these reasons, both Plans contained "forfeiture-for-competition" provisions, permitting IBM to cancel an employee's unexercised stock options and restricted stock if he went to work for an IBM competitor after leaving IBM. The forfeiture provisions contained no limitations for time, place, or scope. Both Plans provided that New York law governs all determinations made under the Plans.

When he retired, Lucente had been awarded 12,283 shares of restricted stock (11,162 under the 1982 Plan and 1,121 under the 1989 Plan) as well as 126,739 stock options (under the 1989 Plan). Lucente's stock options were freely exercisable from the first anniversary of the date of the award until ten years after that date. IBM had awarded Lucente's options between May 1983 and January 1991 at exercise prices ranging between $96.69 and $159.50 per share. Thus, his options were set to expire at various dates between May 1993 and the end of January 2001. Lucente had not exercised any of his stock options prior to his retirement.

The restricted stock operated under a different timetable than his stock options.

Under the Plans, an employee who retired would receive the stock out of escrow on the date of his retirement or on his sixtieth birthday, whichever came later. In 1993, however, IBM changed its Plan provisions so that the limitations on restricted stock awards would be lifted no later than one year after an employee's retirement, regardless of his age. When he retired in 1991 Lucente was not yet sixty, and therefore expected to receive his restricted stock award on his sixtieth birthday (January 1, 2000). (Under the 1993 revision, Lucente would have received his stock in the fall of 1993.)

## B. Lucente's Retirement from IBM

In the fall of 1990, some few months before he retired, Lucente began to sense that he was no longer in favor at IBM. For example, during a visit to Tokyo in October 1990, Akers reversed a major decision that Lucente had made. Two months later, Akers told Lucente that his business plan for the coming year was unacceptable and that Akers was sending another executive to Tokyo to work as Lucente's assistant group executive. Eventually, Akers informed Lucente that he was being replaced in Tokyo.

During their discussions about what awaited Lucente when he returned from Tokyo, Akers told him to expect a job of lesser responsibility. This was so, according to Akers, because there were only two or three jobs of responsibility similar to the Tokyo position in the entire company. Although Akers never offered Lucente a specific position before he retired, Akers did raise the possibility that Lucente might pursue various senior positions in the company. In their discussions, Akers encouraged Lucente to seek the best opportunity that he could find, either within IBM or, ominously, at another company.

Thereafter, Lucente accepted a position at Northern Telecom. Lucente had met with Paul Stern, the CEO of Northern Telecom, in the summer of 1990, to discuss employment possibilities. In the fall of 1990, Lucente had several meetings with Stern and others at Northern Telecom. Lucente joined Northern Telecom as the Senior Vice President of Marketing, with a general understanding that he would eventually serve as President and Chief Operating Officer, and potentially succeed Stern as CEO, of the company. Lucente received a salary of $750,000 per year at Northern Telecom, approximately $100,000 more than his yearly salary at IBM, as well as stock options and a variety of other benefits.

When he retired, IBM told Lucente that Northern Telecom would not be deemed an IBM competitor, thereby ensuring that he would keep his IBM restricted stock and stock options while working at Northern Telecom. In February 1991, IBM and Lucente entered into a letter agreement (the "Letter Agreement"). This letter, sent by W.E. Burdick, Senior Vice President of Personnel at IBM, and signed by Lucente, set out the details of Lucente's retirement:

> In connection with your retirement from IBM, we will pay you a special payment of $675,000. . . .
>
> . . . .
>
> Following your retirement, other than your employment with Northern Telecom, which we deem not to be competitive or in conflict with the best interests of IBM based on the facts in your situation, you shall not engage in any activity as an employee, consultant, or director, personally or with any firm or organization, that is or becomes, in IBM's sole opinion, a competitor of IBM or its subsidiaries, or is otherwise prejudicial to or conflicts with the interests of IBM. This

agreement is in addition to the provisions of the IBM Employee Confidential Information and Invention Agreement. . . . Your outstanding stock options and restricted stock continue to be subject to the Termination of Employment sections of the IBM Stock Option Plans, the 1989 Long Term Performance Plan, and the [1982] IBM Variable Compensation Plan.

Additionally, by virtue of his thirty years at IBM, Lucente retired with his full IBM pension of approximately $250,000 per year.

## C. *IBM's Cancellation of Lucente's Incentive Awards*

Lucente worked at Northern Telecom for two years. When another executive was named President of the company, Lucente realized that he would not succeed Stern. He resigned from Northern Telecom and began looking for another job.

In early April 1993, Lucente considered accepting the position of Vice President of Worldwide Sales and Marketing at Digital Equipment Corporation ("Digital"), an IBM competitor. On April 8th, 1993, concerned about the status of his IBM restricted stock and stock options, Lucente consulted IBM before signing the Digital agreement (he had already verbally accepted) to inquire whether his employment at Digital would affect his IBM restricted stock and stock options. Four days later, IBM's General Counsel, Dan Evangelista, told Lucente that working for Digital would indeed be a violation of his non-compete agreements. Nevertheless, on April 14th, Lucente chose to accept Digital's offer: a base salary of $630,000, a minimum bonus of $150,000, as well as thousands of shares of Digital stock and stock options.

On April 15, 1993, IBM sent a letter (the "cancellation letter") to Lucente informing

him that his restricted stock and stock options were now cancelled as a result of his employment with Digital. On this date, all of Lucente's stock options were "underwater"; that is, their exercise prices (between $96 and $159) were greater than the market price for IBM shares ($48). Over the next few years, Lucente repeatedly asked IBM to reconsider this decision. IBM, however, refused to reverse its decision. Regrettably for Lucente, IBM's stock price increased considerably after 1993.

## II. *Proceedings Below*

Because of the unusual turn of events this case experienced before the district court, we set out a detailed procedural history below.

### A. *Lucente's Complaint*

Lucente filed his Complaint ("Original Complaint") in Alabama state court in 1999. IBM removed the case to the United States District Court for the Southern District of Alabama and then successfully moved to transfer the case to the Southern District of New York (McMahon, *J.*).

Lucente's Original Complaint began by stating, in summary fashion, that IBM "has breached, or has expressed an unequivocal intent to breach, its contractual obligations" under the 1982 and 1989 Plans. (R. at 21). Then, in Count One of the Complaint, Lucente specified that "IBM has breached its obligations under the Plans by notifying Lucente that IBM has cancelled Lucente's Restricted Stock awards and his unexpired stock options." (R. at 28). The Complaint further alleged that IBM "prevented" Lucente from exercising his stock options and "denied" him his restricted stock. (R. at 28). In its Answer and Counterclaim, IBM asserted a claim for breach of contract based on Lucente's purported violation of the non-

competition provisions of the Letter Agreement and sought $675,000. Following discovery, the parties filed cross-motions for summary judgment.

### B. *Summary Judgment*

Lucente moved for summary judgment on his breach of contract claim, as well as IBM's counterclaim against him. IBM's motions for summary judgment focused on three discrete issues: (1) the application of New York's employee choice doctrine, (2) the forfeiture-for-competition provisions of the 1982 Plan, and (3) potential damages.

The district court ruled in Lucente's favor. *Lucente v. IBM,* 117 F.Supp.2d 336 (S.D.N.Y.2000) ("*Lucente I* "). It found as a matter of law that New York's employee choice doctrine did not apply because no reasonable juror could find that Lucente left IBM voluntarily. *Id.* at 344. Relying on the deposition testimony of Lucente and Akers, the district court concluded that the only fair inference a jury could draw is that "Akers asked Lucente to leave." *Id.* at 346.

Having found the employee choice doctrine inapplicable, the district court next found as a matter of law that the forfeiture-for-competition provisions in IBM's 1982 and 1989 Plans were unreasonable. *Id.* at 350. Likewise, the district court found for Lucente on IBM's counterclaim. Specifically, it held as a matter of law that the non-competition provisions of the Letter Agreement were unenforceable. It also ruled that IBM's payment of $675,000 to Lucente was completely unrelated to the non-competition provisions of the Letter Agreement. *Id.* at 351–52.

Turning to damages, the district court held that the date of IBM's breach was April 15, 1993—the date that IBM cancelled Lucente's restricted stock and stock options. *Id.* at 353. It concluded, howev-

er, that it would be "manifestly unreasonable" to measure Lucente's restricted stock damages as of that date because the stock was not out of escrow at that time. *Id.* at 358. Thus, using the conversion method of damages set forth in *Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136 (2d Cir.1983), the district court determined that Lucente was entitled to the higher of: (1) the value of the stock in November 1993 when it would have been released from escrow (had it not been cancelled seven months earlier); or (2) the highest intermediate value between the date of the release from escrow and the end of a reasonable period thereafter. *Id.* at 141. According to the district court, it would be left to a jury to determine the proper measure of damages under this standard. With respect to the damages for Lucente's stock options, the district court rejected Lucente's proposed model and held that damages would be measured according to the net present value of Lucente's options at the time of the breach in April 1993.

## C. Lucente's Purported Exercise of Stock Options

At this summary judgment intersection, the case took a bizarre turn. In his motion for reconsideration of the district court's summary judgment opinion, Lucente asserted for the first time that IBM's cancellation letter was just an anticipatory repudiation and that he had elected to ignore it while awaiting IBM's future performance under the Plans. (R. at 642). During oral argument on the reconsideration motion, counsel for IBM noted that the anticipatory repudiation theory was barred because Lucente had taken no action to exercise any of his options over the past eight years. Counsel further noted that it remained to be seen whether Lucente would take any action to exercise the remaining options that IBM had awarded to Lucente in January 1991, which were to expire two weeks' thereafter (the "January 2001 options"). (R. at 733). The district court then opined that if Lucente were her client, "I would make damn sure that I could nail down my claim for two million dollars" by tendering payment to IBM for Lucente's remaining stock options. (R. at 745).

Lucente apparently agreed, because a few days after oral argument he sent a check for $1,889,948.88 to Louis Gerstner, CEO of IBM, purporting to exercise his option to purchase 60,692 shares of IBM stock at $31.14 per share.[1] On January 23, 2001, IBM, through its counsel, rejected Lucente's purported exercise of these stock options and returned Lucente's check.

## D. The District Court's Reconsideration Opinion

The district court began its reconsideration opinion by suggesting that Lucente failed to meet the stringent requirements for such a motion. Nevertheless, the district court chose to respond to Lucente's newly minted anticipatory repudiation theory in a lengthy opinion because, *inter alia,* Lucente "may have misapprehended the impact of IBM's cross-motion for a declaration about how to measure damages...." *Lucente v. IBM,* 146 F.Supp.2d 298, 303 (S.D.N.Y.2001) ("*Lucente II*").

With regard to Lucente's restricted stock damages, the district court held that Lucente could not rely on a theory of

---

1. After IBM's award of 15,173 stock options to Lucente in 1991, IBM stock experienced two splits, 2–for–1 each time. Therefore, Lucente saw himself entitled to four times his award (60,692 shares) at an exercise price of $31.14 (one fourth of the original exercise price).

anticipatory breach. Adhering to its original ruling, the court confirmed that Lucente's restricted stock damages should be measured from a reasonable period of time after Lucente would have received the stock in unrestricted form. Unlike its original ruling, however, where it held that this issue was a jury question, the court now made that determination itself. Based on factual declarations that the parties submitted after discovery, the district court found that Lucente would have received his restricted stock on November 10, 1993. Further, it determined that seven weeks was a reasonable period for Lucente to assimilate the necessary information about his stock. Using a conversion method of damages, the district court then calculated Lucente's restricted stock damages at $733,909.25. *Id.* at 307–08.

With regard to Lucente's stock options damages, the court held that Lucente had already elected to treat IBM's cancellation letter as a breach, rather than an anticipatory repudiation. *Id.* at 316. Accordingly, Lucente's stock option damages were to be measured from that date. However, the district court offered Lucente the opportunity to amend his Original Complaint to allege an election to treat IBM's cancellation letter as an anticipatory repudiation that was rejected with regard to his January 2001 options. Because IBM had rejected Lucente's tender of a check for these stock options, the district court found that an anticipatory repudiation theory was viable only if Lucente amended his Complaint. Such an amendment would allow Lucente to recover damages for the January 2001 options, the only options that were timely exercised. *Id.* at 316–17.

### E. *The Amended Complaint and Subsequent Proceedings*

Taking the district court up on its offer, Lucente filed an Amended Complaint. Af-

ter incorporating by reference his Original Complaint in its entirety, Lucente's Amended Complaint simply added the factual history of Lucente's attempt to exercise the January 2001 options. In conclusion, the Complaint noted that Lucente "hereby elects as his remedy with regard to such wrongfully dishonored options the highest inherent value of such options within a reasonable time after IBM rejected Lucente's attempted exercise of such options." Amended Complaint at 3 (R. at 785–86).

IBM requested a court conference to seek clarification of several issues arising out of Lucente's Amended Complaint. At this conference, counsel for Lucente clarified that Lucente had indeed elected to treat IBM's cancellation letter as an anticipatory repudiation, which he had chosen to ignore. (R. at 805). Notwithstanding that Lucente had made this election while realleging all the allegations in his Original Complaint—including that IBM *breached* the contract in *1993*—the district court accepted his new election as a choice of remedies for IBM's breach. When IBM then sought permission to file an Answer to Lucente's Amended Complaint, the district court informed IBM that it was not entitled to submit an Answer or assert affirmative defenses to Lucente's new allegations. (R. at 806.) Further, the district court refused IBM's requests to take additional discovery on the factual allegations in Lucente's Amended Complaint, or to challenge the Amended Complaint's allegations in a motion to dismiss or for summary judgment. *Id.* Through these actions, the district court effectively granted a second summary judgment to Lucente on the claims in his Amended Complaint. Finally, the district court asked the parties to stipulate to damages respecting Lucente's stock options.

The parties were unable to hammer out a joint stipulation as to Lucente's stock option damages. Instead, they submitted to the court duelling stipulations regarding the damages Lucente was entitled to for his January 2001 stock options. IBM's proposed stipulation, which was expressly conditioned on Fed.R.Evid. 408 (statements made in compromise negotiations not admissible in evidence), detailed the various methods of exercising stock options through a broker. IBM concluded that Lucente would have executed a "market sell order" [2] and would have received a payment of approximately $3,746,820.62, had his tender been accepted. Not surprisingly, Lucente argued in his proposed stipulation that Lucente was attempting to execute an "exercise and hold" [3] transaction which would have resulted in stock option profits of $4,824,067.62.

## F. *The District Court's Order Calculating Damages*

In its final opinion in this case, the district court recognized that the parties fundamentally disagreed over the method Lucente used to exercise stock options in January 2001. The district court nevertheless chose to treat the parties' opposing stipulations as Statements of Undisputed Fact pursuant to Local Rule 56.1. *Lucente v. IBM*, 151 F.Supp.2d 484, 485 & n. 1 (S.D.N.Y.2001) ("*Lucente III* "). It then found, as a matter of law, that Lucente had attempted to exercise his stock options using the "exercise and hold" method and awarded Lucente stock option damages of $4,824,067.62. Including prejudgment interest and the damages previously calculated by the district court for restricted

stock, the court entered a judgment in Lucente's favor for $6,270,253.40.

## DISCUSSION

### I. *Lucente's Breach of Contract Claim*

#### A. *Standard of Review*

We review a district court's grant of summary judgment *de novo*. *Republic Nat'l Bank of New York v. Delta Air Lines*, 263 F.3d 42, 46 (2d Cir.2001).

Although misapplied in this case, the standards governing summary judgment are well-settled. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994).

In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant, in this case IBM. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Weinstock v. Colum-*

---

**2.** A "market sell order" is characterized by the optionee exercising and selling his shares of stock simultaneously. Thus, the optionee receives a cash payment of the difference between the cost to exercise and the sale proceeds, minus taxes and fees.

**3.** Under the "exercise and hold" method, the optionee exercises the options and then keeps the resulting shares of stock.

*bia Univ.*, 224 F.3d 33, 41 (2d Cir.2000). Stated more succinctly, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Therefore, summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party. *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In short, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...." *Id.* at 255, 106 S.Ct. 2505.

### B. *The Employee Choice Doctrine*

The bedrock question in this case is whether Lucente quit or was fired. IBM contends that the district court's grant of summary judgment to Lucente on his breach of contract claim was erroneous because there are genuine issues of fact surrounding this question. We agree.

 The parties agree on one thing: New York law governs this diversity action. New York courts disfavor restrictive covenants in the employment context and will generally enforce them only to the extent they are reasonable and necessary to protect valid business interests. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 856–57, 712 N.E.2d 1220 (1999); *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 421 N.Y.S.2d 847, 848, 397 N.E.2d 358 (1979). There is, however, one salient exception: New York courts will enforce a restrictive covenant without regard to its reasonableness if the employee has been afforded the choice between not competing (and thereby preserving his benefits) or competing (and thereby risking forfeiture). *Post*, 421 N.Y.S.2d at 848–49, 397 N.E.2d 358; *Kristt v. Whelan*, 4 A.D.2d 195, 164 N.Y.S.2d 239, 243 (1st Dep't 1957) ("It is no unreasonable restriction of the liberty of a man to earn his living if he may be relieved of the restriction by forfeiting a contract right or by adhering to the provisions of his contract."), *aff'd without opinion*, 5 N.Y.2d 807, 181 N.Y.S.2d 205, 155 N.E.2d 116 (1958).[4] This "employee choice doctrine" assumes that an employee who elects to leave a company makes an informed choice between forfeiting a certain benefit or retaining the benefit by avoiding competitive employment. *Kristt*, 164 N.Y.S.2d at 243.

 Although New York courts have not sketched out every detail of the employee choice doctrine, three strokes are bold and clear. *First*, an employer can rely on the doctrine only if it can demonstrate its continued willingness to employ the party who covenanted not to compete. *Post*, 421 N.Y.S.2d at 849, 397 N.E.2d 358.

---

4. In *Bradford v. New York Times Co.*, 501 F.2d 51 (2d Cir.1974), this Court suggested that the employee choice doctrine no longer applied in New York because, *inter alia*, few cases had relied on it since *Kristt*. As it turned out, however, the reports of the doctrine's demise were greatly exaggerated. Five years after *Bradford*, the New York Court of Appeals applied the doctrine in *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 421 N.Y.S.2d 847, 848, 397 N.E.2d 358 (1979). In light of *Post*, it is clear that the employee choice doctrine is alive and well in New York.

*Second,* when an employee is involuntarily discharged without cause, the employer cannot invoke the benefits of the doctrine. *Id.* Enforcing the non-competition provision under such circumstances would be "unconscionable" because it would destroy the mutuality of obligation on which a covenant not to compete is based. *Id.* *Third,* the factual determination whether an employee was involuntarily terminated is generally not appropriate for summary judgment. *Id.*

▮ Applying these standards to the present case, the district court's grant of summary judgment on Lucente's breach of contract claim was erroneous. In finding that Lucente had been involuntarily terminated by IBM (and therefore that the employee choice doctrine was inapplicable), the district court resolved numerous factual discrepancies in Lucente's favor. In so doing, the court usurped the jury's province as fact-finder.

In concluding that Lucente was fired, the district court relied on selective and incomplete deposition testimony while ignoring substantial evidence that Lucente's departure from IBM was indeed voluntary. For example, the district court credited Lucente's testimony that Akers told him that IBM would not have a job for him when he returned from Tokyo. Akers, however, testified that he discussed with Lucente the different job opportunities that were available to him at IBM, including various senior staff jobs. (R. at 206–08). Further, Akers maintained that "it was perfectly all right by me [for Lucente] to stay in the IBM Company if that was his choice." (R. at 206). Indeed, Akers was adamant that "[Lucente] knew he had a job in IBM if he wished to stay." (R. at 208). While it is undisputed that Akers never offered Lucente a specific job at IBM, Akers stated that he was "work[ing] on that." (R. at 206). That Lucente

agreed to take a job at Northern Telecom *before* Akers offered him a specific job at IBM does not compel the conclusion that Lucente was involuntarily terminated. It may well undercut Lucente's claim of involuntary termination in the face of Akers's testimony that Lucente had a job at IBM if he wanted one. In any event, this is a jury question.

Likewise, the district court relied on selective testimony from Akers regarding his belief that it was in IBM's best interests if Lucente sought employment outside of the company. In so doing, the district court ignored Akers's testimony qualifying this statement in which he noted that IBM's best interest was served only insofar "that [Lucente] find an opportunity that excites him, that energizes him, that gives him a chance to succeed from his point of view as opposed to working in the IBM Company knowing that he has topped out, at least temporarily." (R. at 209).

Moreover, the district court ignored evidence presented by IBM that Lucente's move to Northern Telecom was voluntary. It is undisputed that Northern Telecom offered an extremely lucrative compensation package to Lucente, with a base salary approximately $100,000 higher than his IBM salary. It is also significant that Northern Telecom offered Lucente the opportunity to succeed the CEO after a few years, an opportunity that Lucente acknowledged was highly unlikely at IBM.

Finally, it is undisputed that Lucente met with the CEO of Northern Telecom in the summer of 1990, several months before he began to sense that he was no longer in favor at IBM. The district court chose to credit Lucente's explanation that this meeting was merely an exploratory meeting arranged at the request of a headhunter. *Lucente I,* 117 F.Supp.2d at 345 n. 3. Putting aside the fact that the district court was required to construe all reason-

able inferences in favor of IBM, the *non-moving* party, it is naive to believe that such a meeting is always so innocuous. It is equally plausible that long before he was replaced in Tokyo Lucente, who had expressed interest in becoming the CEO of some corporation, felt that he was not going to achieve that position at IBM and sought out a company to provide that opportunity.

In any case, the substantial evidence presented by IBM that it was willing to continue to employ Lucente upon his return from Tokyo, coupled with the evidence suggesting that Lucente's leap to Northern Telecom was long-planned and extremely advantageous to him, both in terms of monetary reward and career satisfaction, require that we reverse the district court's determination that the employee choice doctrine is inapplicable.

### C. *Lucente's Other Contentions*

■ Lucente continues to press the argument, raised unsuccessfully before the district court, that his restricted stock was not subject to forfeiture under the terms of the 1982 Plan. He relies on paragraph 13 of that Plan, which provides that IBM's "obligation to make any payment" under the Plan "is subject to the condition that for the entire period of deferral or restriction" the "employee shall not render services for any organization" that competes with IBM. Lucente argues that the delivery of restricted stock does not fall under paragraph 13. This argument need not detain us long.

As the district court correctly found, the 1982 Plan is replete with references to "payment" in conjunction with restricted share awards. *Lucente I,* 117 F.Supp.2d at 343. Moreover, the preamble to the 1982 Plan states that all "awards" are subject to the "[r]estrictions on transferability, and conditions of forfeiture" set out in "paragraphs 7(c), 8, 12, *and 13* of the Plan." (R. at 62) (emphasis added). In short, the terms of the 1982 Plan unambiguously establish that restricted stock awards are indeed subject to forfeiture.

■ Equally unavailing is Lucente's claim that awards under the 1982 Plan are not forfeitable because the Plan is a pension plan covered by ERISA. This argument was not properly preserved for appeal, as Lucente never raised it below and the district court did not address it in any of its opinions. *Caiola v. Citibank, N.A.,* 295 F.3d 312, 327 (2d Cir.2002). Even if the issue were ripe for review, however, the 1982 Plan is clearly exempted from ERISA's non-forfeitability provisions. *See* 29 U.S.C. § 1051(2) (exempting plans that are unfunded and designed primarily to provide deferred compensation for select executives); *Demery v. Extebank Deferred Comp. Plan(B),* 216 F.3d 283, 287–88 (2d Cir.2000).

### D. *The District Court's Reasonableness Inquiry*

Our reversal of the district court's grant of summary judgment to Lucente obviates any need to examine its conclusion that the forfeiture provisions of the 1982 and 1989 Plans were unreasonable as a matter of law. The factual inquiry into the reasonableness of these provisions cannot be undertaken until a jury determines whether Lucente had a choice to remain at IBM or was involuntarily terminated, and therefore whether the employee choice doctrine applies to this case.

### II. *IBM's Counterclaim*

IBM also contends that the district court's grant of summary judgment dismissing its breach of contract counterclaim against Lucente should be reversed. We agree.

IBM's counterclaim alleged that Lucente breached the Letter Agreement's non-competition provisions; IBM sought to recover the $675,000 it had paid Lucente pursuant to the Letter Agreement. The district court granted summary judgment to Lucente on this claim after finding that the Letter Agreement's non-competition provisions were: (1) unrelated to Lucente's $675,000 severance payment; and (2) unreasonable as a matter of law. *Lucente I*, 117 F.Supp.2d at 350–51. We find both of these conclusions erroneous.

## A. *Contract Interpretation*

 We review the district court's grant of summary judgment on this contract dispute *de novo* and "employ[ ] the same tests as those applied at the district court." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993). "Summary judgment is only proper in contract disputes if the language of the contract is wholly unambiguous." *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir.1994) (internal quotations omitted). When the language of a contract is susceptible to different interpretations and "where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment." *Sayers*, 7 F.3d at 1094 (internal quotations omitted).

 Ascertaining whether the language of a contract is clear or ambiguous is a question of law to be decided by the court. *Mellon Bank*, 31 F.3d at 115. Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement...." *Sayers*, 7 F.3d at 1095 (internal quotations omitted). No ambiguity exists, however,

"when contract language has a definite and precise meaning, unattended by danger of misconception ... and concerning which there is no reasonable basis for a difference of opinion." *Id.* (internal quotations omitted).

Here, each party makes reasonable arguments to support its reading of the non-compete provisions of the Letter Agreement. Lucente, for example, emphasizes that the severance payment, which appears in a paragraph separate from the non-competition language, is not explicitly conditioned on the non-competition language. In response, IBM points out that because Lucente was already subject to separate non-competition agreements under the Plans, there would be no reason to include the non-competition provision in the Letter Agreement unless it was related to the $675,000 payment to Lucente. The parol evidence in the record suggests that there are two reasonable interpretations of the Letter Agreement. The Letter Agreement is therefore ambiguous, and summary judgment was improperly granted.

## B. *Reasonableness Inquiry*

The district court's conclusion that the Letter Agreement's non-competition provisions were unreasonable suffers from the same flaw as its finding on IBM's liability: there are material, disputed issues of fact regarding whether Lucente left IBM voluntarily. As discussed above, this reasonableness inquiry can only be undertaken if a jury first determines that Lucente was fired by IBM.

## III. *The Amendment of Lucente's Complaint*

IBM contends that the district court erred in granting Lucente leave to amend his Complaint to change his theory of recovery. IBM also claims that the district court abused its discretion in failing to

permit it to file an Answer to Lucente's Amended Complaint or to take additional discovery on the new allegations in Lucente's Amended Complaint. IBM is correct on both counts.

## A. *Standard of Review*

■ We review a district court's decision to grant a party leave to amend his complaint for abuse of discretion. *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 283 (2d Cir.2000). Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993) (per curiam). One appropriate basis for denying leave to amend is that the proposed amendment is futile. *Nettis v. Levitt*, 241 F.3d 186, 193 (2d Cir.2001); *see also Health–Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir.1990) ("[W]here, as here, there is no merit in the proposed amendments, leave to amend should be denied."). An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir.2002).

## B. *Anticipatory Repudiation*

■ The district court concluded that Lucente treated IBM's cancellation letter as a breach of contract—but only with regard to his *restricted* stock—while treating the same letter as a mere anticipatory repudiation which he elected to ignore with regard to his stock *options*. Apart from allowing Lucente to have his cake and eat it too, such a result is antithetical to the common law precepts of anticipatory repudiation and the election of remedies doctrine.

■ Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty. *See, e.g., Franconia Assocs. v. United States*, —— U.S. ——, ——, 122 S.Ct. 1993, 2002, 153 L.Ed.2d 132 (2002); *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664, 667, 705 N.E.2d 656 (1998); John D. Calamari and Joseph M. Perillo, *The Law of Contracts* § 12–3 (3d ed.1987). When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit. *Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (3d Dep't 1999); *Rachmani Corp. v. 9 East 96th Street Apartment Corp.*, 211 A.D.2d 262, 629 N.Y.S.2d 382, 384 (1st Dep't 1995); *see also Apex Pool Equipment Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir.1969).

■ The non-repudiating party must, however, make an affirmative election. He "cannot at the same time treat the contract as broken and subsisting," for "[o]ne course of action excludes the other." *Inter–Power*, 686 N.Y.S.2d at 913 (internal quotations omitted). Indeed, "[t]he law simply does not ... permit a party to exercise two alternative or inconsistent ... remedies." *Apex*, 419 F.2d at 562 (quoting 5 Walter H.E. Jaeger, *Williston on Contracts* § 688 (3d ed.1961)). Once a party has elected a remedy for a particular

breach, his choice is binding with respect to that breach and cannot be changed. *See id.* at 562; *ESPN, Inc. v. Office of the Commissioner of Baseball,* 76 F.Supp.2d 383, 389–90 (S.D.N.Y.1999) ("Nor may the party choose one avenue and then change its mind.").

 In determining which election the non-repudiating party has made, "the operative factor ... is whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he had made an election." *Bigda v. Fischbach Corp.,* 898 F.Supp. 1004, 1013 (S.D.N.Y.1995). There is no specific time limit within which to make this election and generally, an election need not be made until the time comes when the party making the election must render some performance under the terms of the contract. *See id.* At this point, "either performing or failing to perform will indicate an election." *Id.* (quoting 5 *Williston on Contracts* § 688 at 274).

Here, where Lucente was under no obligation to exercise his stock options, it is impossible to identify a precise date on which Lucente was forced to make his election.[5] Nevertheless, there is overwhelming evidence that Lucente elected to treat IBM's cancellation letter as a breach, not as a repudiation which he ignored.

First and foremost, Lucente expressly stated in his Original Complaint that IBM's cancellation letter was a breach of contract that entitled him to damages.

 Second, as the district court itself noted, Lucente did not have any ripe

claims under the theory of anticipatory repudiation when he filed this lawsuit. Under an anticipatory repudiation theory, a plaintiff who elects to treat a repudiated contract as valid does not have an action against the repudiating party until an actual breach occurs. *See, e.g., Franconia Assocs.,* —— U.S. at ——, 122 S.Ct. at 2002. Since it is undisputed that Lucente failed to take action to exercise any of his stock options before filing this suit, Lucente had no claim for breach against IBM under the theory of anticipatory repudiation. Therefore, the only claim that Lucente could possibly have asserted in 1999 was that IBM breached its contractual obligations by cancelling his restricted stock and stock options in April 1993.

Third, Lucente's own conduct after receiving IBM's cancellation letter demonstrates that he did not believe that his restricted stock and stock options were still valid. For example, Lucente wrote several letters to IBM seeking reconsideration of its decision to cancel his restricted stock and stock options. In one of these letters, Lucente complained that it was unfair for IBM to have cancelled his restricted stock while he acknowledged that "it was certainly IBM's right to do so under the provisions of the restricted stock award." (R. at 394). Another letter acknowledged IBM's decision to "revoke" his restricted stock and stock options and requested support in having them "reinstated." (R. at 438).

Most telling, however, is that after IBM's alleged repudiation Lucente did

---

**5.** Because of this type of uncertainty, New York courts have generally limited the doctrine of anticipatory breach to bilateral contracts requiring mutual and interdependent obligations. *See, e.g., LIRR Co. v. Northville Indus. Corp.,* 41 N.Y.2d 455, 393 N.Y.S.2d 925, 930, 362 N.E.2d 558 (1977); *Acacia Nat'l Life Ins. Co. v. Kay Jewelers, Inc.,* 203

A.D.2d 40, 610 N.Y.S.2d 209, 212 (1st Dept. 1994). However, we have treated the cancellation of a plaintiff's unexercised stock option contract as an anticipatory repudiation under New York law. *See Hermanowski v. Acton Corp.,* 580 F.Supp. 140, 143 (E.D.N.Y.1983), *aff'd in relevant part,* 729 F.2d 921 (2d Cir. 1984) (per curiam).

nothing for almost six years that would reflect his intention to treat IBM's cancellation letter as a mere repudiation that he chose to ignore while awaiting IBM's performance under the Plans. Lucente's inaction is affirmative evidence of his election; by failing to carry out his obligations under the option contract (until the district court recommended he do so almost eight years after IBM's cancellation and two years after filing his Original Complaint), Lucente indicated that he was treating IBM's cancellation letter as a breach of contract.

While Lucente contends that he declined to exercise his stock options because he thought doing so was futile, this argument backfires on him; if he really thought that exercising his options was futile, then by hypothesis he was *not* awaiting IBM's performance and could not proceed under an anticipatory repudiation theory. In short, it is simply impossible to reconcile Lucente's failure to exercise tens of thousands of valuable stock options with the suggestion that he treated IBM's cancellation letter as a nullity.

Finally, before his Complaint was amended Lucente had consistently litigated this action on the premise that he regarded IBM's 1993 cancellation of his incentive awards as a breach. For example, Lucente's own damages expert, John Vaught, calculated Lucente's damages using April 15, 1993 as the date of the breach. Moreover, Lucente has always maintained that he is entitled to recover damages for stock options that expired unexercised prior to the filing of his Complaint. This claim is untenable if Lucente had in fact rejected IBM's 1993 cancellation. *See Lucente II*, 146 F.Supp.2d at 311–15 (discussing the well settled law that an optionee must exercise his option in order to have rights under the underlying contract). Therefore, we conclude as a

matter of law that Lucente elected to treat IBM's cancellation letter as a breach of contract for both his restricted stock and stock options.

In sum, Lucente's eleventh-hour attempt to change his theory of recovery (at the urging of the district court) is barred by substantive contract law; thus, his attempt to amend his complaint was futile. Accordingly, the district court abused its discretion by permitting Lucente to amend his complaint. Lucente's Original Complaint will govern the resolution of this action.

■■■ Our determination that the district court abused its discretion in granting Lucente leave to amend his Complaint obviates the need for us to address the court's refusal to allow IBM to file an Answer or seek additional discovery based on the allegations in Lucente's Amended Complaint. We feel compelled to point out, however, that the court's decision contravened a cardinal rule of civil procedure: an amended complaint ordinarily renders the original complaint of no legal effect. It is as though the original complaint was never served. *See, e.g., In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir.2000). Consequently, "a court may not deprive an affected party of the right to file a response to an amended pleading if the party so desires." 3 James Wm. Moore et al., *Moore's Federal Practice* § 15.17[5] (3d ed.2002).

## IV. *Damages*

Because we vacate the district court's liability rulings and its award of summary judgment, its damages rulings are necessarily vacated as well. We address the damages rulings now, however, in order to ensure that, on remand, the jury will be properly instructed as to the legal framework within which it is to calculate Lucente's damages.

The district court calculated Lucente's restricted stock damages as of December 1993, rather than at the time the breach occurred eight months earlier. This it did based on its belief that it would be "manifestly unreasonable" to measure Lucente's restricted stock damages before the restricted shares were out of escrow. *Lucente I*, 117 F.Supp.2d at 358. Employing a conversion measure of damages (also known as the highest intermediate price rule) according to *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136 (2d Cir.1983), the district court determined that Lucente was entitled to the highest intermediate value of the stock between the date of its release from escrow and the end of a reasonable period thereafter, which it then found to be seven weeks. *Lucente II*, 146 F.Supp.2d at 307–08.

As for Lucente's stock option damages, the district court permitted Lucente to elect whether to recover the value of his stock options at the date of IBM's alleged breach (approximately $330,000) or the value of the January 2001 options that he attempted to exercise (approximately $4.8 million). To no one's surprise, Lucente chose the latter course of action.

**A. Standard of Review**

 "Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir.1991) (internal quotations omitted). Therefore, our review of the district court's damages' valuation methodology is plenary.

**B. The Parties' Contentions**

IBM asserts that the district court's principal error in calculating damages was in failing to measure Lucente's damages from the date of IBM's alleged breach in April 1993. It maintains that by using a conversion measure of damages and valuing Lucente's restricted stock as of December 1993, the court ignored binding precedent in this Circuit. IBM insists that the court should have employed the traditional breach of contract damage analysis set forth in *Hermanowski v. Acton Corp.*, 580 F.Supp. 140, 144–46 (E.D.N.Y.1983), *aff'd in relevant part*, 729 F.2d 921 (2d Cir.1984) (per curiam). Using this methodology, IBM maintains that Lucente's damages should be limited to the sum of the net present value on April 15, 1993 of his restricted stock and stock options.

In his cross-appeal, Lucente insists that specific performance is the most appropriate relief for IBM's breach of contract. Like IBM, Lucente argues that the district court selected the wrong date in measuring damages. According to Lucente, however, the district court should have measured his restricted stock damages as of January 2000, when the stock was scheduled to be released from escrow under the original terms of the Plans.

Lucente also maintains that the district court was correct in using a conversion measure of damages because of the unique circumstances of this case. As for his stock option damages, Lucente contends that he should be awarded the profit that he would have realized on his unexpired options had he exercised them when he filed his Complaint in February 1999, as well as the value of his expired options on the dates that they expired.

**C. Damages' Analysis**

We conclude that the district court erred in employing a conversion measure of damages to Lucente's breach of contract claim.

### 1. *Specific Performance*

As the district court recognized, before the "extraordinary" equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice. *See, e.g., Leasco Corp. v. Taussig,* 473 F.2d 777, 786 (2d Cir.1972); Calamari & Perillo, *The Law of Contracts* § 16–1. Here, Lucente cannot meet that test. There is simply no reason why, assuming a jury finds IBM liable for breach of contract, money damages would not adequately compensate Lucente for IBM's breach. *See Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 320 N.Y.S.2d 225, 232–33, 269 N.E.2d 21 (1971) (noting that specific performance is not appropriate where the claim involves publicly traded stock).

### 2. *Breach of Contract Damages*

We begin our analysis with the fundamental principle that damages for breach of contract should put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract. *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 495 (2d Cir.1995). New York courts are clear that breach of contract damages are to be measured from the date of the breach. *See, e.g., Simon,* 320 N.Y.S.2d at 232, 269 N.E.2d 21; *Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 825 (2d Cir.1990). We have stated that New York's rule for "[m]easuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account." *Sharma,* 916 F.2d at 826. We have also noted that New York courts "have rejected awards based on what 'the actual economic conditions and performance' were in light of hindsight." *Id.* (quoting *Aroneck v. Atkin,* 90 A.D.2d 966, 456 N.Y.S.2d 558, 559 (4th

Dep't 1982)). "[New York's damages] rule is precisely the same when the breach of contract is nondelivery of shares of stock." *Simon,* 320 N.Y.S.2d at 232, 269 N.E.2d 21.

Although these cases dealt with stock that was not restricted, we have found no New York cases suggesting that a different rule would apply to restricted stock. Therefore—without deciding the issue—we question whether the district court's decision to measure Lucente's restricted stock damages as of eight months after IBM's purported breach was correct.

We think it clear, however, that the district court erred in calculating Lucente's damages under a conversion, rather than breach of contract, measure of damages. In applying a conversion measure of damages, the district court ignored binding precedent in this Circuit. *See Hermanowski,* 729 F.2d at 922. In *Hermanowski,* the district court considered whether damages in a breach of contract action involving stock options should be calculated on the date of the breach or, under a conversion measure, by the highest market value of the stock between the time of the breach and a reasonable time thereafter. 580 F.Supp. at 144–45. The district court rejected Hermanowski's attempt to employ a conversion method of damages because his claim was for breach of contract, not the tort of conversion. *See id.* at 145. The district court then applied the traditional rule that damages for breach of contract are "determined by the loss sustained or the gain prevented at the time and place of breach." *Id.* at 145 (citing *Simon,* 320 N.Y.S.2d at 232, 269 N.E.2d 21). We affirmed in relevant part "substantially for the reasons set forth in the decision of the district court" and specifically agreed that "damages should be determined as of [the] date [of the breach]." *Hermanowski,* 729 F.2d at 922.

Here, as the district court noted, Lucente did not plead a claim in conversion. Even if he had, it would have been time-barred. *See* N.Y. C.P.L.R. § 214(4) (McKinney 2001) (three-year statute of limitations for conversion claims). Despite these impediments, Lucente insists that a conversion measure of damages is still available to him. He relies heavily on a sentence from *Schultz* in which we noted that many cases have followed the highest intermediate value rule where stock was "converted [or] not delivered according to contractual or other legal obligation." 716 F.2d at 141. · Additionally, Lucente relies on one district court case that, without serious analysis, employed the highest intermediate value in a breach of contract case. *See Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 535–36 (S.D.N.Y.2001).

Lucente's reliance on *Schultz* and *Primavera* is misplaced. Lucente (as well as the district court) fails to recognize that we are bound by our decision in *Hermanowski,* decided after *Schultz,* in which we expressly rejected the invitation to employ a conversion measure of damages in breach of contract cases. 729 F.2d at 922. We see no reason to re-examine our precedent. It is also worth noting that the Third Circuit recently rejected the use of a conversion method of damages in a breach of contract case involving stock options. *See Scully v. U.S. WATS, Inc.,* 238 F.3d 497, 512–13 (3d Cir.2001) (interpreting federal and New York law); *see also Agostinelli v. DeBartolo Realty Corp.,* No. 01 CA 9–10, 2001 WL 1647218, at *8 (Ohio Ct. App. Dec. 19, 2001) (noting that "New York does not recognize" the highest intermediate price rule in breach of contract cases).

Accordingly, the district court's damages' methodology must be reversed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED. We hereby REMAND this action to the district court for further proceedings not inconsistent with this opinion.